107 F.2d 627 (1939)
LUKENS STEEL CO. et al.
v.
PERKINS et al.
No. 7368.
United States Court of Appeals for the District of Columbia.
Decided August 4, 1939.
On the Merits October 3, 1939.
*628 *629 Roberts B. Thomas, of New York City, O. Max Gardner, of Washington, D. C., and Frederick H. Knight, of Philadelphia, Pa., for appellants.
Edward J. Ennis, of New York City, and Charles E. Rhetts, of Washington, D. C., for appellees.
Joseph Kovner, of Washington, D. C., amicus curiæ for Steel Workers Organizing Committee.
R. M. O'Hara, of Washington, D. C., amicus curiæ for Andrews Steel Co. et al.
John F. Budke, of Franklin, Pa., amicus curiæ for Parkersburg Iron & Steel Co.
Before MILLER, EDGERTON, and VINSON, Associate Justices.
PER CURIAM.
This cause was specially set down for argument on the appellants' (plaintiffs') petition for an injunction against the above named appellees (defendants) restraining them from continuing in effect a determination made under date of January 16, 1939, by appellee McLaughlin, as Acting Secretary of Labor, pursuant to "An Act To provide conditions for the purchase of supplies and the making of contracts by the United States, and for other purposes.", approved June 30, 1936, 49 Stat. 2036, 41 U.S.C.A. § 35 et seq. We had previously granted an injunction pendente lite, which will be continued in effect.
The case was fully argued at the hearing and has been given due consideration. Justices MILLER and VINSON are of opinion that the complaint states a valid cause of action entitling the plaintiffs to an injunction as prayed therein and, therefore, are of opinion that the District Court was in error in dismissing the complaint. The grounds of this court's opinion will be filed shortly, and Justice EDGERTON will file a dissenting opinion. A judgment will thereupon be entered remanding the cause to the District Court, with instructions to set aside and vacate its previous order dismissing the complaint, and directing that court to proceed in accordance with the opinion of this court.

On the Merits.
MILLER, Associate Justice.
In 1936, Congress enacted a statute[1] which, among other things, provides that "in any contract made and entered into by any * * * agency * * * of the United States * * * for the manufacture or furnishing of materials, supplies, *630 articles, and equipment in any amount exceeding $10,000, there shall be included * * *" five representations and stipulations, the second of which reads as follows:[2]
"That all persons employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under said contract." [Italics supplied]
The complaint filed by appellants in the lower court alleged that on or about January 16, 1939, appellee McLaughlin, purporting to act pursuant to the statute, issued a determination  in which appellee Perkins actively participated, and which she authorized, approved and consented to  determining:
"(2) That the prevailing minimum wages for persons employed in the manufacture or furnishing of the products of the Iron and Steel Industry are the amounts indicated for each of the following localities whether arrived at on a time or piece work basis:

* * * * * *
"6. 62½ cents per hour in the locality consisting of Ohio, Pennsylvania, Delaware, Maryland, Kentucky, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, and Maine, and that portion of the State of West Virginia comprised within the counties of Hancock, Brooke, Ohio, Marshall, Harrison, and Monongalia, and the District of Columbia." [Italics supplied]
This determination was challenged in the lower court, and is challenged here, as void, beyond the authority of the appellees Perkins and McLaughlin to make, arbitrary and capricious, and wholly without warrant or authority of law; particularly in its employment of the word locality to describe an area consisting of thirteen states, a portion of a fourteenth, and the District of Columbia as well. The challenge is well justified and the lower court erred in dismissing the complaint. The determination in this particular is not only unwarranted but incongruous.
It is true that the word locality is one of somewhat indefinite meaning.[3] Still, its indefiniteness has certain well recognized limits in common meaning and usage,[4] which exclude and forbid the interpretation placed upon the word by the appellees in their determination. It is true that within the proper limits of the meaning of locality, the Secretary is required by the statute to exercise judgment and discretion; but the determination in this case goes so far beyond any possible proper application of the word as to defeat its meaning and to constitute an attempt arbitrarily to disregard the statutory mandate. The rule therefore  that where the adoption of one of several possible interpretations of a doubtful statute involves the exercise of judgment and discretion, upon which the duty of an officer to perform a particular act depends, the courts cannot control the exercise of that discretion[5]  has no application in the present case.[6]
Popular acceptance and usage accord to the word locality connotations of common interest and understanding, such as are revealed in the following expressions: Local self-government,[7] our local schools, *631 local interests, a local concern,[8] local option,[9] local boy makes good, local items as used in newspapers, local prejudices, local talent.[10] Its meaning is suggested also by such terms as local anesthetic, and location as used in mining law,[11] and in motion picture parlance. In ordinary and common usage locality is synonymous in meaning with such words as place, vicinity, neighborhood and community.[12] These words, also, are too indefinite to be used for purposes of exact measurement in terms of acres or square miles.[13] But neither they nor locality itself, in any case, connote large geographical areas, with widely diverse interests, such as the fourteen states and the District of Columbia, grouped in the protested determination. The word place, in its ordinary significance, has a distinctly limited meaning as is indicated by such expressions as place of birth, place of origin, the old home place, ore in place, and by the word placement as used in the game of tennis. Would a jury from the vicinity of Brooklyn be acceptable  within the well known rule[14]  for the trial of an accused person in St. Lawrence County, New York, to say nothing of Sussex County, Delaware? Would it be a normal use of the word to say that folks in Van Buren, Maine, neighbor with those in the District of Columbia, or in Monongalia County, West Virginia? To ask these questions is to answer them. The word community[14a] connotes a congeries of common interests arising from associations  social, business, religious, governmental, scholastic, recreational  involving considerations of public health, fire protection, water, sewage, transportation, and other services, which bind together the people of such a community or set them quarreling with each other. The only community of interest revealed by the determination in the present case is steel and iron manufacture. It could almost as well be said that because Esperanto groups throughout the world have a community of interest, the whole world is a locality.
*632 Words which approximate in meaning the definition contended for by appellees are area, region, province, territory, river basin, drainage area, water shed. In the Report of the Public Contracts Board[15]  and upon which it is alleged that the protested determination was based  the words area and region are used throughout. The Report reveals that no attention was paid therein to the concept of locality specified in the statute. In fact, the basis of the determination  assuming the correctness of appellants' allegations, as we are bound to do upon a motion to dismiss[16]  is revealed throughout the Report by such language as the following: "The predominant minimum wage practice in this industry comes to light only when we view the practice of the industry as a whole or over broad regional areas" [Italics supplied]; and again by the following language: "These various producing centers occupy relatively small areas and none of them can be called geographic regions. It should be noted that the variations in base rates between a majority of the producing centers are not wide. * * * The question here is whether these relatively small wage variations between relatively small geographical areas should be made the basis for separate findings of prevailing minimum wages which would be limited to the locale of the variation." [Italics supplied] The Report and the determination both answered the question in the negative; deliberately rejecting the delegation of power given by the statute and assuming a power neither given nor intended thereby.[17]
It is significant that appellees cite no cases which support or suggest a meaning for the word locality comparable in geographical *633 area or scope with the meaning given to it in the protested determination. But they argue that the use of the word locality in the Public Contracts Act in preference to the language "city, town, village, or other civil subdivision of the state" which is used in the Davis-Bacon Act[18] "clearly discloses the congressional intent that the word `locality' shall not be restricted to a civil subdivision of the state." In this they are no doubt correct. Congress obviousy had in mind a local center of manufacture. This might lie entirely within a civil subdivision; but on the other hand it might overlap from one civil subdivision to another, or perhaps it might even overlap a state line. In order to avoid the difficulties inherent in a mandate to determine minimum wages paid within such civil subdivisions, Congress, instead, kept in mind the habits of industry itself, which frequently disregards imaginary political boundary lines, and establishes itself in economically strategic positions, determined by supplies of raw material and labor, and facilities for marketing, such as water and rail transportation. Localities develop in much the same manner as do industrial centers. A combination of a river, a rough mountainous terrain, deposits of coal and iron, and a hardy, independent people, is apt to produce a community, a neighborhood, which may in turn become a city or town, which may result in the formation of a county; but which, on the other hand, may be less or greater in area than such arbitrary political subdivisions. Sometimes such localities precede and sometimes follow the development of industrial and production centers.
It is vitally significant that Congress in its effort to deal with such industrial centers  rather than with civil subdivisions  did not use a word such as region or area, which might have been susceptible of the meaning for which appellees contend. It chose instead a word of limited meaning, long and well known to those acquainted with the American tradition. It is a settled rule of statutory construction that Congress will be presumed to have used language in its usual significance and in accordance with common understanding.[19]
Appellees contend that to attribute to the word locality a limited  i. e., its well settled  meaning would produce difficult and objectionable problems of administration. While this may be true, it constitutes no reason for disregarding the clearly expressed intention of Congress. Administrative convenience and public interest may, under some circumstances, coincide. But it is not always so. Governmental functions may involve a multiplicity of administrative details. It would no doubt be much more convenient for the Postmaster General if a few large centers could be used for the collection and distribution of mail. But in that case, as in the present, Congress has spoken in terms of governmental service to be performed on a basis of localities; with all the administrative inconvenience which may follow the carrying out of its mandates. If the language used by Congress had been obscure, then the argument of hardship and inconvenience might be persuasive. "But considerations of this nature can never sanction a construction at variance with the manifest meaning of the legislature, expressed in plain and unambiguous language."[20] If the language is plain and the meaning clear, the duty of interpretation does not arise and the sole function of the courts is to enforce the statute according to its terms.[21]
Again, appellees contend that their *634 interpretation should be adopted by virtue of the rule that an administrative construction consistently adhered to and not plainly erroneous should be followed by the courts. That rule, if applicable under the circumstances of the present case, would bar judicial review of administrative action in all cases. The statute under which appellees purport to act was not approved until June 30, 1936, just two years and eight months prior to the filing of the complaint in this case; the Public Contracts Board was not created until October 6, 1936; the Report of the Public Contracts Board was dated October 27, 1938; and the protested Determination was not issued until January 16, 1939, forty days prior to the filing of the complaint in the present case. The record is bare of any showing of "administrative construction consistently adhered to" except the bald assertion to that effect contained in the Determination itself, dated January 16, 1939, and upon which appellees rely. In other words, we are asked to respect and follow an administrative construction first announced only forty days prior to the commencement of suit to challenge that construction.
The rule which appellees seek to apply, as revealed by the cases upon which they rely, relates to construction and practice of long standing,[22]  revealed by the issuance of regulations,[23] granting of permits[24] and otherwise[25]  made known to Congress[26] and acquiesced in by it.[27] Moreover, the rule relates to the interpretation of an ambiguous or doubtful statute, not one plain on its face as in the present case. "A custom of the Department, however long continued by successive officers, must yield to the positive language of the statute."[28] Obviously, therefore, the rule has no application here.
The clearly expressed purpose of the statute is that the Secretary shall determine "the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished * * *"[29] and not that he shall impose upon such local industries "the predominant minimum wage practice" of the industry viewed "as a whole or over broad regional areas." To permit the Secretary to establish a minimum wage scale for the area embraced within fourteen states and the District of Columbia would be to defeat rather than to accomplish the purpose of the Act.[30] Under the circumstances it is not necessary to look farther to discover the legislative intent. But if there were any element of vagueness or uncertainty in the language used, either as to the purpose of the Act in using the word locality[31] or as to *635 the intent of Congress that the Secretary of Labor should not be empowered thereby to fix wages,[32] it would be eliminated immediately by reference to explanations given on the floor of the House by those in charge of the measure.
Appellees contend that the present suit is in fact one against the United States; that the latter is an indispensable party which, not having given its consent, cannot be sued. It is true, as a general rule, that the United States is an indispensable party in certain suits in which the judgment or decree rendered may substantially affect its interests;[33] but all suits against public officers do not fall within the operation of that rule.[33a] Thus, it has long been recognized that an officer who acts outside the scope of his jurisdiction and without authorization of law may be liable even in damages for injuries suffered by a citizen as a result thereof.[33b] And the *636 Supreme Court has in numerous instances approved the use of injunction process in clear cases of illegal action or threatened illegal action by public officers.[34] By reason of their illegality, the acts or threatened acts of such officers are personal and derive no official justification from their being done in asserted agency for the Government.[35]
The jurisdiction of the lower court in the present case depended upon the allegations of the bill of complaint.[36] The bill did not ask the court to interfere with the official discretion of the appellees. It challenged their authority to do the things of which complaint was made.[37] If the allegations of the complaint are true  and we must assume this to be the fact  the action complained of in the present case was not an interpretation of law within the scope of appellees' authority,[38] as in Wells v. Roper;[38a] *637 or within the range of their statutory discretion,[39] as in Morrison, Jr., v. Work[39a] and Transcontinental & Western Air, Inc. v. Farley;[39b] but, instead, it was a palpable evasion of the letter and spirit of the pertinent statute. It was an arbitrary attempt "wholly to disregard the statutory mandate"; "to act in the teeth of a [the] statute."[40] In such a case "the suit rests upon the charge of abuse of power, and its merits must be determined accordingly; it is not a suit against the United States."[41]
Appellees contend, also, that their actions are not subject to judicial review and restraint because the protested determination is not an order but a mere "finding" which does not command appellants to perform an act or refrain from performing an act; specifically, that no order  based upon such finding  has been issued "directing the Appellants or anyone else to bid upon Government contracts and to agree to pay the prescribed minimum wage." This contention is without merit. No order was required to make the determination effective. By its own terms, it was made binding and effective upon all interested persons and agencies. Thus, it was expressly provided that the "determination shall be effective and the minimum wages hereby established for the respective localities shall apply to all contracts awarded subject to Public Act No. 846, 74th Congress, on or after January 31, 1939." [Italics supplied][42]
While the decision thus rendered may not be an "order" in the sense that it does not command or enjoin action,[43] it has legal effect and is final and binding upon all persons desiring to submit bids for government contracts, as well as upon all government agencies. In this respect the determination is similar to many which have been successfully challenged in the courts. Thus, no order was issued in the McAnnulty case,[44] directing the American School of *638 Magnetic Healing, or anyone else, to conduct or refrain from conducting business by mail, and, similarly, no order was issued in the case of Waite v. Macy,[45] requiring anyone to import or refrain from importing tea. In Red Canyon Sheep Co. v. Ickes,[46] no order was issued requiring complainant to exercise or refrain from exercising the privilege of grazing sheep upon the public domain. Likewise, in Utah Fuel Co. v. National Bituminous Coal Comm.,[47] the Supreme Court, although dismissing the complaint on the merits, sustained the jurisdiction of the District Court to hear a challenge of the authority of the Coal Commission to direct a disclosure of allegedly confidential information already in its possession. The determinations attacked in these cases  as in the case at bar  were not addressed to the parties complaining but were directed to and purported to govern the activities of administrative officials in carrying out duties created by statute.
Neither is it necessary that special legislative authorization be found in order to permit use of injunction process. As the Supreme Court recently said: "We have held that the determination of the Commission is not an `order' reviewable under the Urgent Deficiencies Act of October 22, 1913. Shannahan v. United States, supra [303 U.S. 596, 58 S.Ct. 732, 82 L.Ed. 1039]. But we have not held that the determination of the Commission was not subject to judicial review by other procedure, a question which, as we said in the Shannahan Case, we had no occasion there to consider. Id., [303 U.S.] at page 603, 58 S.Ct. 735 [82 L.Ed. 1039]. The nature of the determination points to the propriety of judicial review. * * * Equity jurisdiction may be invoked when it is essential to the protection of the rights asserted, even though the complainant seeks to enjoin the bringing of criminal actions."[48]
But appellees contend that appellants have no right which can be protected by injunction; that they are no better off in this respect than would be an ordinary taxpayer.[49] This contention, also, is without merit. In Tennessee Electric Power Co. v. Tennessee Valley Authority,[49a] the Supreme Court discussed the doctrine that one threatened with direct injury by the act of an agent of the Government "which, but for statutory authority for its performance, would be a violation of his legal rights, may challenge the validity of the statute in a suit against the agent." and *639 said: "The principle is without application unless the right invaded is a legal right,  [1] one of property, [2] one arising out of contract, [3] one protected against tortious invasion, or [4] one founded on a statute which confers a privilege." [Numbers in brackets added][50] Certainly the principle should not be less broadly stated in the present case where appellants are not challenging the validity of the statute but are contending, instead, that appellees acted and threaten to act, in violation of the statute, without authority of any kind. In fact, four of the nine cases cited by the Supreme Court, in illumination of the language quoted, were ones in which the acts of the officer were alleged to be without statutory authorization, as in the present case.[51]
It is not denied that appellants have a general legal right to carry on their business free from unlawful restraints,[52] but it is contended that no such right is interfered with or molested in the present case  that the determination of the Secretary of Labor is not applicable to appellants' business generally but only to transactions with the Government; that appellants have no legal right to do business with any particular individual; that especially they have no legal right to do business with the Government under any terms or conditions, hence, it is immaterial that an administrative official imposes an unlawful condition. In support of their position, appellees rely upon such cases as B. F. Cummins Co. v. Burleson, 40 App.D.C. 500; O'Brien v. Carney, D.C.D.Mass., 6 F.Supp. 761; and Colorado Pav. Co. v. Murphy, 8 Cir., 78 F. 28, 37 L.R.A. 630. These cases are not in point. They hold merely that the lowest bidder is not entitled to an injunction against the letting of a contract to another bidder, or of mandamus to compel an award, since these acts require the exercise of judgment and discretion which cannot be controlled by judicial process. They do not hold that a person has no legal right to deal with the Government in the ordinary course of his business and to bid in competition with others on government contracts; provided, of course, that he observes terms or conditions lawfully imposed.[53] On the contrary, the right to carry on business, generally, necessarily includes the right to negotiate with prospective customers and purchasers free from unlawful restrictions and interference.[54] In this respect it is immaterial whether the prospective customer be a private individual or a government agency. In fact, the right of a person to bid on government contracts is a more valuable right  because of the policy adopted by Congress to encourage free and full competition  than is his right to seek the patronage of private individuals. In the latter case, the prospective customer may decline to carry on business, upon any ground, whether of reason, of whim, caprice, prejudice or malice.[55] Section 3709, R.S., 41 U. S.C.A. § 5, on the other hand, imposes a duty upon the government departments to advertise publicly for bids and proposals, except when the public exigencies require otherwise, and to award contracts to the lowest responsible bidders.[56]
*640 Cases such as American School of Magnetic Healing v. McAnnulty,[57] Gegiow v. Uhl,[58] Waite v. Macy,[58a] and Red Canyon Sheep Co. v. Ickes,[58b] present situations analogous to that of the present case. The right of the complainants which was infringed in the McAnnulty case was "the legal right under the general acts of Congress relating to the mails to have their letters delivered at the post office as directed," and to conduct their mail order business. In the Gegiow case it was the right to enter and remain in the United States subject to the conditions imposed by Congress. In the Waite case it was the right to import tea subject only to the conditions imposed and permitted to be imposed by the statute. In the Red Canyon Sheep Co. case it was the privilege of carrying on the business of sheep raising upon the public domain, subject only to similar statutory conditions and limitations. In the present case it is the right to bid for government contracts and, if awards are made, to perform such contracts under the general acts of Congress relating to such matters, in each case subject only to limitations and conditions imposed or permitted to be imposed by Congress.
A person need not conduct business by mail, or import tea, or graze sheep, or migrate to the United States, unless he wishes to do so, but it is his right to do so, and if he does he can be subjected to any lawful limitation imposed by Congress. Similarly, a citizen need not bid for government contracts but it is his right to do so, and if he does he, too, can be subjected, similarly, to any lawful limitation imposed by Congress.[59] But when any person, private or official, attempts to interfere with these rights by unlawful limitations not imposed or allowed to be imposed by Congress, then relief may be obtained upon a proper showing. A statute, by prescribing the conditions and limitations which properly may be imposed upon one who seeks to enjoy a right, prohibits the denial of the right upon other grounds.[60] In the present case, appellees admit that appellants have a right to bid on government contracts. They argue that appellants may bid on any terms they choose, and without including the minimum wage stipulation required by the protested determination. But bidding in the manner suggested would be a useless gesture, foredoomed to failure, because of the imposition of the unlawful requirements; hence, the imposition of such requirements is tantamount to a denial of the right to bid in the first instance.
In the present case, as in the ones last cited, the complainants "had violated no law which Congress had passed";[61] nevertheless, in each case their rights have been interrupted and blockaded by "the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law and is in violation of the rights of the individual."[62]
Appellees contend that appellants have failed to allege facts which show that any injury is sufficiently impending and threatening to justify the exercise of equity jurisdiction. It appears from the complaint that appellants are engaged in the production and sale of products of the iron and steel industry, within the area of fourteen states and the District of Columbia determined by appellees to constitute a locality; that they employ common laborers at wages ranging from 52½ to 56½ *641 cents per hour, which in each case, respectively  at Coatesville, Pennsylvania, at Montgomery County, Pennsylvania, at South Chester, Pennsylvania, at Harrisburg, Pennsylvania, at Colgate, Maryland, and at Branford, Connecticut  constitutes the minimum base rate of pay for common labor in the iron and steel industry, although wages paid to common laborers in other employments in such localities are much lower; that four of the seven appellants are parties to agreements with groups of organized labor, which provide for the payment of the common labor base rates specified; that five of the seven appellants have sold iron and steel products to various agencies of the United States for many years, particularly to the Departments of War, Navy and Interior; that the principal products sold have consisted of steel plates, sheets, pipe, slabs, high pressure gas cylinders, steel fianges and aerial bombs; that approximate amounts of gross sales by certain of the appellants to agencies of the United States during 1937 were, respectively: Lukens, $107,750, Alan Wood, $134,000, Harrisburg, $184,807, Eastern, $27,000; and during 1938: Lukens, $277,749, Alan Wood, $185,400, Harrisburg, $71,436, Eastern, $3,350; that only during short periods in more than 20 years has Central been without a government contract in progress; that "Lukens presently is a party to four contracts made with the Department of the Navy the performance of which has not been completed. The sales price of the iron and steel products to be furnished under such contracts is approximately $100,000"; that Alan Wood has unfilled orders from the War and Navy Departments for iron and steel products, the price of which aggregates approximately $200,000; that the tonnage of products furnished by Central to agencies of the United States during the last ten years has averaged approximately 8% of its total product; that each of the appellants desires to continue to bid on such contracts and carry on similar business with agencies of the United States in the future. The complaint then sets out the various capacities in which appellees Morgenthau, Peoples, Swanson, Woodring, Ickes, and Farley, act in the making of contracts for such products as are manufactured by appellants; it sets out sections of the Public Contracts Act previously referred to; it recites the procedure followed by appellees Perkins and McLaughlin in arriving at the protested determination, together with portions of that determination. It further sets out that appellees Perkins and McLaughlin are threatening to make the determination effective; that the determination is "void and wholly beyond the authority" of said appellees; that they "acted arbitrarily and capriciously and wholly without warrant or authority in law"; that the protested determination constitutes an attempt by said appellees "purporting to act in their respective official capacities above set forth and under the guise and pretense of determining the minimum wages actually prevailing in the respective localities in which the plants of plaintiffs and other manufacturers of products of the Iron and Steel Industry are located, but, in fact, acting completely beyond any authority conferred upon them by law, to raise and fix the wage rates to be paid at such plants." It further appears from the complaint that appellees Perkins, McLaughlin and Walling "have been and are threatening to require that there be included in every contract made and entered into after March 1, 1939, by any agency of the United States, for the manufacture or furnishing of products of the Iron and Steel Industry (as that Industry is defined in the Determination), in any amount exceeding $10,000, a stipulation or representation that any person employed by the contractor in the manufacture or furnishing of any of such products used in the performance of the contract will be paid, without subsequent deduction or repayment on any account, not less than the minimum wages set forth in the Determination, or a stipulation or representation of like purport and effect; * * *." It appears further that appellee Peoples, "acting pursuant to the direction and instruction of the defendants Perkins, McLaughlin and Walling, and purporting to act as Director of Procurement, has directed and threatens to continue to direct every agency of the United States desiring to enter into any such contract after March 1, 1939, to include such a stipulation in such contract and the invitations to bid therefor." It appears further that a regulation issued by appellee Perkins requires the insertion of the said stipulation in contracts for the manufacture of such materials; that invitations to bid on such contracts, issued by appellee Swanson, contain a statement that such determination and the wages therein *642 established shall be effective; that appellees Morgenthau, Swanson, Woodring, Ickes and Farley intend to and will, unless restrained, require the insertion of a similar stipulation in all contracts awarded under their direction; that large appropriations have been made by Congress for purchase of such materials; that large and important contracts are soon to be let; that appellants desire to bid on such contracts and that unless appellees are enjoined and restrained, appellants will suffer immediate and irreparable injury for which they have no adequate remedy at law for the following reasons, among others:
(i) The plaintiffs will be deprived of their lawful right to bid on contracts for the manufacture or furnishing to any agency of the United States, including the executive departments of which the heads thereof are defendants named herein, of any of the products of the Iron and Steel Industry (as defined in the Determination), free of limitations other than those imposed by Congress, and will be precluded from selling to any such agency any of such products, unless the plaintiffs shall agree, in each contract for the sale to any such agency of any such products in an amount in excess of $10,000, to pay the persons employed in the performance of such contract at the rate of wages specified in the Determination. The plaintiffs will be deprived of such right, and will be required so to agree, not by any statute of the United States or by any action lawfully taken thereunder by any officer or agent of the United States, but by reason of arbitrary and capricious acts of the defendants in excess of and without warrant of, but under color of, authority conferred upon them by law.
(ii) As heretofore shown herein, the bids on substantial contracts to be awarded by or under the authority of the defendant Swanson, on which contracts or parts thereof certain plaintiffs heretofore named desire to submit bids, are to be opened on or shortly after March 1, 1939. As also heretofore shown herein, numerous other valuable and important contracts will be let by or under the authority of defendants named herein within a relatively short time after March 1, 1939. If the plaintiffs should submit bids upon any such contract, and enter into any such contracts, which include stipulations or representations in terms or to the effect that the plaintiffs will pay to persons employed by the plaintiffs in the performance of such contracts the minimum wages set forth in the Determination, the plaintiffs would be in danger of being estopped, and counsel for the plaintiffs have advised the plaintiffs that a court might hold that they were estopped, to secure a judicial determination of the invalidity of the Determination. Moreover, the penalties provided in Sections 2 and 3 of the Act, 41 U. S.C.A. §§ 36, 37, for non-compliance with any such stipulation or representation would impose upon the plaintiffs the burden of obtaining a judicial decision of the question of the validity of the Determination only upon the condition that, if unsuccessful, the plaintiffs must pay excessive penalties, have their contracts subject to cancellation, and be precluded from obtaining the award of any public contract for three years, unless the Secretary of Labor otherwise recommends. Such penalties are so severe as in effect to close all approaches to the courts and deprive the plaintiffs of any adequate remedy at law in the premises.
(iii) As has heretofore been shown, the rates of pay for wage earners employed by the plaintiffs at other than common labor base rates of the respective plaintiffs for common labor are generally ascertained by adding various differentials to such common labor base rates, respectively, and an increase in such common labor base rates will, as a practical matter, necessarily result in an increase in the rates of pay for such other persons. Furthermore, it will be impracticable, in the case of any of the plaintiffs who enter into contracts with an agency of the United States requiring an increase in the base rate of pay for persons employed in a particular plant by such plaintiff in the performance of such contract, to fail correspondingly to increase the base rate of pay for other wage earners employed by such plaintiff on other matters in such plant.
(iv) If the plaintiffs are required to pay the minimum wages fixed in the Determination, there is grave danger that they will no longer be able successfully to compete for Government contracts since large, fully integrated companies enjoying more favorable geographic locations from the standpoint of proximity to sources of supply for the raw materials used by them, *643 proximity to the markets for their products and freight rate differentials should be able to underbid plaintiffs, if the plaintiffs must pay the same minimum wages as such competitors are now paying. On the other hand, if plaintiffs do not agree to pay such minimum wages, they will be in grave danger of losing a substantial source of revenue.
These allegations sufficiently present every requisite to the exercise of equity jurisdiction for the protection of the rights which appellants assert.[63] Moreover, the threat of injury in this case is made greater by the provisions of the Act which penalize failure to conform to orders and determinations made thereunder.[64]
Appellees contend that the complaint should be dismissed because appellants have not exhausted their administrative remedy.[65] But no administrative remedy is provided by the Act to meet the grievances alleged in the complaint, and no administrative remedy is otherwise available. The Act does not contemplate unlawful conduct beyond its terms and entirely outside the scope of its authority. Section 6, 41 U.S.C.A. § 40, which appellees contend establishes an administrative remedy, provides for application to the Secretary of Labor for exception from the operation of the Act, but only (1) at the instance of the "head of the contracting agency or department" upon a written finding that adherence to the Act would seriously impair government business, or (2) upon joint recommendation of the contracting agency and the contractor after a contract has been made. The section further provides that the Secretary may make rules and regulations allowing exemptions from the Act, but we have been referred to no such action by the Secretary. Section 6 assumes a proper determination within the scope of the Act and pursuant to the authority thereof. The procedure therein provided could not possibly be used to challenge the authority of appellees to act as they have done. Moreover, even if that procedure were available to appellants, its use would admit the legality of the protested determination and leave them at the mercy of appellees in carrying out their unlawful purposes.
Appellants request also a judgment under the appropriate statute[66] declaratory of their rights in the premises. A determination of the propriety of that request involves consideration of questions of law which have heretofore been discussed.[67] However, a declaratory judgment may be given even though there be *644 insufficient allegations of threatened irreparable injury to support a prayer for relief by injunction.[68] As the complaint in the present case is sufficient in that respect, as well as in others, it follows that appellants would be entitled to declaratory relief in any event.[69]
The case is therefore remanded to the District Court, which is instructed to set aside and vacate its judgment dismissing the complaint, and is directed to proceed in accordance with the opinion of this court.
Reversed.
EDGERTON, Associate Justice (dissenting).
The first section of the Act of June 30, 1936, sometimes called the Public Contracts Act, 41 U.S.C.A. § 35, requires "in any contract made and entered into by any executive department, independent establishment, or other agency or instrumentality of the United States * * * for the manufacture or furnishing of materials, supplies, articles, and equipment in any amount exceeding $10,000," a stipulation "that all persons employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract will be paid * * * not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under said contract." With respect to minimum wages in the iron and steel industry, the Secretary of Labor has divided the United States into six "localities." One "locality" comprises Ohio, Pennsylvania, Delaware, Maryland, Kentucky, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, and Maine, part of West Virginia, and the District of Columbia. The Secretary has determined the prevailing minimum wage in iron and steel, in that locality, to be 62½ cents per hour. This minimum prevails in the Pittsburgh and Youngstown districts, where the great bulk of the steel production in the entire area is concentrated; but there are many plants east of the Pittsburgh district, and very few of these pay as much as 62½ cents for common labor. Appellants, who have sold iron and steel products to the government in the past, operate plants in eastern Pennsylvania, Maryland, and Connecticut, and pay minimum wages which vary from 52½ to 56½ cents per hour. Appellants, contending that 14 States are not a "locality" and also that they were not accorded the hearing contemplated by the Act, filed in the court below a bill to compel the Secretary of Labor to withdraw the determination; to enjoin the Director of the Procurement Division of the Treasury Department, and the Secretaries of War, the Navy, the Treasury, the Interior, and the Postmaster General, individually and in their respective official capacities, from giving effect to the determination in the bidding upon and award of public contracts; and for a declaratory judgment that the determination is invalid.
Appellees point out that dictionaries recognize a broad sense of "locality"; that a narrow construction of the word, as applied to steel, would defeat the purpose of the act by enabling low-wage concerns to compete for government contracts with high-wage concerns in the same competitive area; and that it would also make the act nearly meaningless as applied to steel, because in a given neighborhood there is frequently only one steel concern, which necessarily pays the wages which prevail *645 in its own plant. This definition is from the Century Dictionary: "locality * * * Any part of space; a situation; position; particularly, a geographical place or situation; as, a healthy locality; the locality of a mineral, plant, or animal." I think the Secretary's construction of the word is a tenable one in the present context. The cases make it doubtful whether we need consider that question, and they make it clear that if the construction is tenable we should not disturb it. United States ex rel. Riverside Oil Co. v. Hitchcock, 190 U.S. 316, 324, 23 S.Ct. 698, 47 L.Ed. 1074; State of Louisiana v. McAdoo, Secretary of the Treasury, 234 U.S. 627, 633, 34 S.Ct. 938, 58 L.Ed. 1506; Adams, Receiver v. Nagle et al., 303 U.S. 532, 542, 543, 58 S.Ct. 687, 82 L.Ed. 999.
I think that, even if the Secretary's construction of "locality" is not tenable, appellants' bill was properly dismissed, for several reasons.
(1) I think the suit is in substance against the United States, and therefore not maintainable without its consent. Suits which "would operate to disturb the whole revenue system of the Government" are in effect suits against the United States. Louisiana v. McAdoo, 234 U.S. 627, 632, 34 S.Ct. 938, 940, 58 L.Ed. 1506.[70] So are suits which, like this one, would operate to disturb the whole contracting system of the government. It is settled that a suit to require conformity to law in the performance or cancellation of public contracts is a suit against the United States. Wells v. Roper, 246 U.S. 335, 38 S.Ct. 317, 62 L.Ed. 755; Transcontinental & Western Air, Inc., v. Farley, 2 Cir., 71 F. 2d 288, certiorari denied 293 U.S. 603, 55 S.Ct. 119, 79 L.Ed. 695; United States ex rel. Shoshone Irrigation Dist. v. Ickes, 63 App.D.C. 167, 70 F.2d 771, certiorari denied 293 U.S. 571, 55 S.Ct. 82, 79 L.Ed. 670; Boeing Air Transport, Inc., v. Farley, 64 App.D.C. 162, 75 F.2d 765, certiorari denied 294 U.S. 728, 55 S.Ct. 637, 79 L.Ed. 1258. No reason appears for distinguishing in this respect a suit, like the present one, to require conformity to law in the process of entering into public contracts. Johnstown Coal & Coke Co., Inc., v. Wilson, D.C., 60 F.2d 557.
The heads of six executive departments of the government are here sued in their official capacities. "That the United States is not named on the record as a party is true. But the question whether it is in legal effect a party to the controversy is not always determined by the fact that it is not named as a party on the record, but by the effect of the judgment or decree which can here be rendered."[71] A judgment or decree in favor of the appellants will control the terms on which the United States may enter into contracts for the necessary work of the Departments of Labor, War, Navy, the Treasury, the Interior, and the Post Office. It will thereby regulate the conduct by the United States of vast activities of unquestioned constitutionality and legality. Although it will not prevent those contracts from being made and those activities from being carried on, it will prevent them from being made and carried on on certain terms. It will have a far larger effect upon the United States than the decree which was sought and refused in Wells v. Roper, supra, for that decree would have controlled only a single contract.
The appellants contend that the particular action which the Secretary of Labor has taken and the other appellees propose to take is unlawful. But it is not contended that the Secretary of Labor has no authority to make minimum wage determinations with respect to public contracts for iron and steel, or that the other appellees have no authority to make public contracts for iron and steel. The appellants, then, ask the court to regulate the discharge by the appropriate government officers of their lawful and vital function of supplying the needs of the government. This is not a case in which, if the appellants are right as to the law, the United States has no occasion to act in the premises; there is occasion, on any view of the law, for the United States to act and for *646 these appellees to act in its behalf. The appellants' complaint is merely that appellees act illegally instead of legally. The fact that they may be acting illegally does not make the suit any the less a suit against the United States. On the contrary: if they were acting legally they could, of course, successfully defend their action on that ground, and the immunity of the United States from suit would be comparatively unimportant. It is only when, as here, the government's representatives may be acting illegally that the rule which forbids a suit against the United States has any great significance. In most of the suits which have been decided to be suits against the United States, and therefore not maintainable without its consent, the courts have either assumed that the defendant officers were acting illegally or have refused to consider the alleged illegality of their action.[72] Where, as in Wells v. Roper, the defendants have declined to deal contractually with the plaintiff on behalf of the United States, the immunity of the United States has barred the suit, however lawless the action of the defendants may have been. In Wells v. Roper the plaintiff had a contract with the United States; here, the plaintiffs hope to make contracts with the United States. The difference does not strengthen their position.
One who seeks public employment is in a different position from one who seeks private employment. In Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L. R.A.1916D, 545, Ann.Cas.1917B, 283, the Supreme Court held that a state statute forbidding employment of foreigners in private industry was unconstitutional; but four weeks later, in Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206, Ann. Cas.1917B, 287, it held that a state statute forbidding employment of foreigners on public works was valid. The ground was that the state could freely determine whom it would employ. The privilege of seeking employment by the sovereign is not, like the privilege of seeking private employment, a constitutional right. Private employment, if obtained, results in claims which are constitutionally entitled to enforcement; but employment by the United States, if obtained, results in no enforcible claims unless the United States chooses to allow them. It is anomalous to enforce against the sovereign, without its consent, a privilege of seeking to acquire claims against it which would themselves be unenforcible without its consent. I know of no case in which it has been held that the courts may, without congressional authorization, inquire whether officers of the United States are exceeding their authority, when the only threatened damage consists in the loss of an opportunity to make money by dealing with the United States.
There are, of course, many cases in which, without the sovereign's consent, the action of the sovereign's officers in its behalf has been held controllable by the courts, in apparent derogation of the sovereign's immunity. But in those cases judicial control of the defendant officers was necessary to the protection of the plaintiff's constitutional rights or, at least, of "rights" of a well-established character, i. e., interests to the protection of which, apart from the sovereign's immunity, the plaintiff was clearly entitled. Examples are United States v. Lee,[73] a suit to recover the plaintiff's land, unlawfully withheld by government officers; Ex parte Young,[74] which restrained state officers from enforcing confiscatory railroad rates; Waite v. Macy,[75] which protected plaintiff's right to import harmless and unforbidden tea; and American School of Magnetic Healing v. McAnnulty,[76] which protected plaintiff's right to use the mails.
(2) Statutes in regard to the making of government contracts are intended for the benefit of the government, not of contractors or bidders. American Smelting & Refining Co. v. United States, 259 U.S. 75, 78, 42 S.Ct. 420, 66 L.Ed. 833. It follows that even an actual bidder, to say nothing of a prospective bidder, cannot complain of the failure of public officers to comply with statutes in regard to the *647 making of contracts. Colorado Paving Co. v. Murphy, 8 Cir., 78 F. 28, 37 L.R.A. 630, (opinion by Judge Sanborn), appeal dismissed, 166 U.S. 719, 17 S.Ct. 997, 41 L.Ed. 1188; Molloy v. City of New Rochelle, 198 N.Y. 402, 92 N.E. 94, 30 L.R.A.,N.S., 126; Talbot Paving Co. v. City of Detroit, 109 Mich. 657, 67 N.W. 979, 93 Am.St.Rep. 604; O'Brien v. Carney, D.C., 6 F.Supp. 761.[77] In this aspect the case is much as if a private corporation's agent should propose to insert in contracts a term inconsistent with his principal's instructions, and third persons wishing to contract with the principal on the principal's terms should thereupon ask a court to compel the agent to conform to them. The principal is the only person who can require the agent to carry out his instructions.
(3) If one of appellants were to be the sole bidder for any particular contract, the wage determination could do it no substantial harm; it would have only to pay the increased wage, and increase its bid proportionately. That, of course, is not the case. Appellants are subject to competition; and they anticipate that, if the alleged illegal determination is enforced, they will be injured by the competition of other concerns better able to pay the required wage. As they express it, "If the plaintiffs are required to pay the minimum wages fixed in the Determination, there is grave danger that they will no longer be able successfully to compete for Government contracts since large, fully integrated companies enjoying more favorable geographic locations from the standpoint of proximity to sources of supply for the raw materials used by them, proximity to the markets for their products and freight rate differentials should be able to underbid plaintiffs, if the plaintiffs must pay the same minimum wages as such competitors are now paying." But there is no contention that it is illegal to pay, or to promise to pay, 62½ cents per hour. Accordingly, the competition from which appellants anticipate injury will be lawful. And it is settled that one cannot complain of or prevent damage by lawful competition, even though the competition or its damaging character may be due to the action by officers of the United States which is attacked as lawless. Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L. Ed. 374; Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543; Louisiana v. McAdoo, 234 U.S. 627, 631, 34 S.Ct. 938, 58 L.Ed. 1506.
(4) While it is contended that one of appellants has lost one contract, the injury which appellants in general anticipate is too contingent to qualify as irreparable injury and support an injunction. Whatever happens to the Determination, they may not choose to bid, may not be the lowest bidders if they do, may not be awarded a contract if they are the lowest bidders, and may not profit from a contract if they get one. Ames & Company v. Wallace, 1 S. Ct.D.C.,N.S., 238.[78]
I think the decree of the District Court dismissing the bill should be affirmed.
NOTES
[1] Public Contracts Act, June 30, 1936, 49 Stat. 2036, 41 U.S.C.A. § 35 et seq.
[2] 49 Stat. 2036, 41 U.S.C.A. § 35(b).
[3] Connally v. General Construction Co., 269 U.S. 385, 394, 46 S.Ct. 126, 70 L.Ed. 322. See Murphy v. Worcester Consol. St. Ry., 199 Mass. 279, 287, 288, 85 N.E. 507, 510; Foster v. Hart Consol. Min. Co., 52 Colo. 429, 435, 122 P. 54, 55.
[4] State v. Tibbetts, 21 Okl.Cr. 168, 205 P. 776, 779.
[5] Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 219, 50 S.Ct. 320, 74 L.Ed. 809; Work v. United States ex rel. Rives, 267 U.S. 175, 177, 45 S. Ct. 252, 69 L.Ed. 561; United States ex rel. Dunlap v. Black, 128 U.S. 40, 48, 9 S.Ct. 12, 32 L.Ed. 354; United States ex rel. Hall v. Payne, 254 U.S. 343, 41 S.Ct. 131, 65 L.Ed. 295; United States ex rel. White v. Coe, 68 App.D. C. 218, 220, 95 F.2d 347, 349.
[6] Red Canyon Sheep Co. v. Ickes, 69 App.D.C. 27, 41, 98 F.2d 308, 322. See Santa Fé Pacific R. Co. v. Lane, 244 U. S. 492, 37 S.Ct. 714, 61 L.Ed. 1275; Waite v. Macy, 246 U.S. 606; Proctor & Gamble Co. v. Coe, 68 App.D.C. 246, 96 F.2d 518, certiorari denied 305 U. S. 604, 59 S.Ct. 65, 83 L.Ed. 384.
[7] Rathbone v. Wirth, 6 App.Div. 277, 290, 40 N.Y.S. 535, 542.
[8] Little Rock v. North Little Rock, 72 Ark. 195, 204, 79 S.W. 785, 788.
[9] People v. Capelli, 55 Cal.App. 461, 463, 203 P. 837, 838; State ex rel. Hoover v. Hickerson, 130 Mo.App. 47, 50, 109 S.W. 108, 109.
[10] See also: Local administration (Workman v. Mayor, D.C.S.D.N.Y., 63 F. 298, 304); local affairs (Brooklyn City R. Co. v. Whalen, 191 App.Div. 737, 740, 182 N.Y.S. 283, 285); local authorities (In re Rochester Electric Ry. Co., 123 N.Y. 351, 356, 25 N.E. 381, 382); local benefits (Rankin v. Yoran, 72 Or. 224, 230, 143 P. 894, 896); local commercial broker (Stratford v. City Council of Montgomery, 110 Ala. 619, 625, 20 So. 127, 128); local drainage (Ford v. Toledo, 64 Ohio St. 92, 97, 59 N.E. 779, 781); local habitation (Greenlee v. Marks, 62 Ind. 418, 420); local officer (People ex rel. Baird v. Nixon, 158 N.Y. 221, 227, 52 N.E. 1117, 1118); local police (State ex rel. Walsh v. Hine, 59 Conn. 50, 60, 21 A. 1024, 1025, 10 L. R.A. 83); local property (San Francisco & S. J. V. R. Co. v. Stockton, 149 Cal. 83, 90, 84 P. 771, 774); local purpose (State ex rel. Adsit v. Allen, 1 Lans., N.Y., 248, 251); local freight (Murphy v. Worcester Consol. St. Ry., 199 Mass. 279, 287, 85 N.E. 507, 510).
[11] St. Louis Smelting & Refining Co. v. Kemp, 104 U.S. 636, 649, 26 L.Ed. 875.
[12] Connally v. General Construction Co., 269 U.S. 385, 394, 395, 46 S.Ct. 126, 70 L.Ed. 322; State v. Tibbetts, 21 Okl. Cr. 168, 205 P. 776, 779.
[13] Connally v. General Construction Co., 269 U.S. 385, 395, 46 S.Ct. 126, 70 L.Ed. 322.
[14] 2 Cooley's Bl. Comm., 4th Ed. 1899, 1491 (Book IV) *350: "When, therefore, a prisoner on his arraignment has pleaded not guilty, and for his trial hath put himself upon the country, which country the jury are, the sheriff of the county must return a panel of jurors, liberos et legales homines, de vicineto: that is, freeholders, without just exception, and of the visne or neighborhood; which is interpreted to be of the county where the fact is committed." Chicago v. Knobel, 232 Ill. 112, 114, 83 N.E. 459, 460: "* * * under the common law, in both civil and criminal cases, the jury were to be taken from the visne or neighborhood  from among the neighbors and equals of the litigants or the accused  and by long usage this came to mean from the body of the county"; Commonwealth v. Collins, 268 Pa. 295, 300, 110 A. 738, 739. See Callan v. Wilson, 127 U.S. 540, 549, 8 S.Ct. 1301, 32 L.Ed. 223; Clement v. United States, 8 Cir., 149 F. 305, 310, certiorari denied 206 U.S. 562, 27 S.Ct. 795, 51 L. Ed. 1189; Spencer v. United States, 8 Cir., 169 F. 562, 565.
[14a] Holmes, The Common Law (1881) 41: "The first requirement of a sound body of law is, that it should correspond with the actual feelings and demands of the community, whether right or wrong." [Italics supplied]
[15] Appointed by the Secretary of Labor, October 6, 1936.
[16] Ickes v. Fox, 300 U.S. 82, 96, 57 S.Ct. 412, 81 L.Ed. 525; Ickes v. Virginia-Colorado Development Corp., 295 U.S. 639, 646, 55 S.Ct. 888, 79 L.Ed. 1627; National Remedy Co. v. Hyde, 60 App.D.C. 252, 253, 50 F.2d 1066, 1067.
[17] Equally revealing are the following apparently inadvertent uses of the word locality and its variants, which appear in the Report: "No particular locale marks out the location of the plants paying the base rates from 50 to 55 cents. These rates are found in localities eastward from Marion, Ohio into New England. * * * Turning now to the subject of geographical location we refer back to the table on pages 79 and 84 for a detailed listing by location of the plants in which the base rates above 54 cents are paid. It will be found that the base rates are paid in the following locations: 55.0  New England; near Buffalo; central Ohio and Indiana; Kansas City and St. Louis, Missouri. 56.0  Kentucky; West Virginia; Philadelphia; western Illinois. 56.25  Central Ohio. 56.5  Sparrows Point, Maryland; Philadelphia vicinity; eastern and central Pennsylvania; northern New Jersey; Syracuse, New York; central Ohio; St. Louis vicinity. 57.0  Philadelphia and vicinity; eastern Pennsylvania; northern New Jersey; New England. 58.0  California; New England. 58.5  Johnstown, Pennsylvania; central Ohio; St. Louis vicinity. 59.5  Buffalo and vicinity; Philadelphia; central Indiana; Chicago vicinity. 60.0  Pittsburgh vicinity; Buffalo vicinity; Duluth, Minnesota; central Indiana; Chicago vicinity; Colorado; Utah; California; Washington. 60.5  Central Ohio. 62.5  Chicago and vicinity; Gary and vicinity; Michigan; central Ohio; Kentucky; Cleveland and vicinity; Youngstown and vicinity; Pittsburgh and vicinity; West Virginia; New Jersey; New England. 63.0  Michigan. 63.5  Pittsburgh. 65.0  California; Michigan. 70.0  Michigan. It will be observed that none of the rates is paid exclusively in any one geographic area except in the few instances where there is only a single plant paying one of the rates. The summary of plant location in connection with the base rates shows that each of the outstanding base rates is paid by plants spread across the Middle West and the East. For instance, 56.5, 58.5, 59.5, and 62.5 cents are paid in plants located in the Middle West and east of Pittsburgh. The Western plants are represented in the scale by the base rates of 58, 60, and 65 cents. These rates are also paid in the Middle West and east of Pittsburgh. While it is apparent that no portion of the wage scale can be assigned exclusively to New England, or east of Pittsburgh, or the Middle West or the West, it is a fact that in a good many localities and areas over the breadth of the country one or another of the base rates is paid to more workers than is any of the other rates. The industry is spread between the four corners of the country. The geographic limits of the industry are as wide apart as Portland, Maine; Seattle, Washington; Duluth, Minnesota; and Fort Worth, Texas. There are plants in 30 states and every section of the country has a share in the production of iron and steel and their products. In some parts of the country the plants are sparsely distributed and in other places they are thickly concentrated around a center of production. The plants are located in or around the large and middle-sized cities, in small communities, and even in rural areas. It is to be expected that differences in location would be reflected in different base rates." [Italics supplied]
[18] Act of March 3, 1931, 46 Stat. 1494, as amended by Act of August 30, 1935, 49 Stat. 1011, 40 U.S.C.A. § 276a.
[19] United States v. Wurts, 303 U.S. 414, 417, 58 S.Ct. 637, 82 L.Ed. 932; Old Colony Trust Co. v. Commissioner of Internal Revenue, 301 U.S. 379, 383, 57 S.Ct. 813, 81 L.Ed. 1169; De Ganay v. Lederer, 250 U.S. 376, 381, 39 S.Ct. 524, 63 L.Ed. 1042; Union Pacific R. Co. v. Hall, 91 U.S. 343, 347, 23 L.Ed. 428; Caminetti v. United States, 242 U.S. 470, 485, 486, 37 S.Ct. 192, 61 L. Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168.
[20] Evans v. Jordan and Morehead, 9 Cranch, U.S., 199, 203, 3 L.Ed. 704. See United States v. Fisher, 2 Cranch, U.S., 358, 386, 2 L.Ed. 304; Crooks v. Harrelson, 282 U.S. 55, 60, 51 S.Ct. 49, 75 L.Ed. 156.
[21] Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168. See United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 409, 34 S. Ct. 337, 58 L.Ed. 658, L.R.A.1915B, 774; Dewey v. United States, 178 U.S. 510, 520, 521, 20 S.Ct. 981, 44 L.Ed. 1170. See also, Houghton v. Payne, 194 U.S. 88, 100, 24 S.Ct. 590, 48 L.Ed. 888.
[22] Swendig v. Washington Water Power Co., 265 U.S. 322, 331, 44 S.Ct. 496, 68 L.Ed. 1036; Wisconsin v. Illinois, 278 U.S. 367, 413, 49 S.Ct. 163, 73 L.Ed. 426 (thirty years).
[23] Brewster v. Gage, 280 U.S. 327, 336, 337, 50 S.Ct. 115, 74 L.Ed. 457.
[24] Wisconsin v. Illinois, 278 U.S. 367, 414, 49 S.Ct. 163, 73 L.Ed. 426.
[25] Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 329, 59 S.Ct. 191, 83 L.Ed. 195 (opinion of Patent Office); Wisconsin v. Illinois, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426 (opinion of Attorney General).
[26] Wisconsin v. Illinois, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426.
[27] United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 84, 53 S. Ct. 42, 77 L.Ed. 175; Santa Fé Pacific R. v. Lane, 244 U.S. 492, 496, 37 S.Ct. 714, 61 L.Ed. 1275.
[28] Houghton v. Payne, 194 U.S. 88, 100, 24 S.Ct. 590, 593, 48 L.Ed. 888; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 330, 331, 59 S.Ct. 191, 83 L.Ed. 195; Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457; Swendig v. Washington Water Power Co., 265 U.S. 322, 331, 44 S.Ct. 496, 68 L.Ed. 1036; Louisville & Nashville R. Co. v. United States, 282 U.S. 740, 757, 759, 51 S.Ct. 297, 75 L.Ed. 672; Texas & Pacific R. Co. v. United States, 289 U.S. 627, 640, 53 S. Ct. 768, 77 L.Ed. 1410; United States v. Tanner, 147 U.S. 661, 13 S.Ct. 436, 37 L.Ed. 321.
[29] 49 Stat. 2036, 41 U.S.C.A. § 35(b).
[30] See Webster v. Luther, 163 U.S. 331, 342, 16 S.Ct. 963, 41 L.Ed. 179.
[31] Wright v. Vinton Branch, 300 U.S. 440, 463, 57 S.Ct. 556, 81 L.Ed. 736, 112 A.L.R. 1455, and cases there cited in note 8.

Extracts from Congressional Record, Vol. 80, Part 9, 74th Cong., 2d Sess.:
(Page 9992.)
"Mr. Greenwood. Mr. Speaker, this resolution from the Committee on Rules provides for consideration of what is known as the Walsh-Healey Bill, which bill regulates specifications in connection with the purchase of supplies by the Government of the United States. It provides that no less than the prevailing minimum wage shall be paid to workers in the community where the supplies are manufactured or where the work is performed."
(Page 9993.)
"Mr. Greenwood. This bill provides that they shall pay the prevailing wages in the community where the work is performed; so the bill takes care of the very proposition of which the gentleman speaks."
(Page 10008.)
"Mr. Citron. The bill before us is in substance an extension of the Bacon-Davis Act to all Government purchases amounting to over $10,000.
* * * * * * *
"The bill merely provides that the Government shall have the right to refuse the bids on all purchases over $10,000 to those * * * (4) who pay less than the prevailing rate of wages in their community, * * *."
[32] The original bill introduced by Congressman Healey (H.R. 11554, 74th Cong., 2d Sess.) contained the following language: "* * * minimum wages fixed under this Act shall be such wages as are fairly and reasonably commensurate with the value of the service or class of service rendered." This language, however, was omitted from the bill as enacted. The reason therefor appears clearly from the statements of the managers on the floor of the House as follows:

(80 Cong.Rec. 10003.)
"Mr. Healey. That is an administrative problem. As I view it, the prevailing wage is already a fact which already exists. The Secretary's duty is simply to inquire and ascertain what that prevailing wage is."
(80 Cong.Rec. 10004.)
"Mr. Walter. * * * If there is any grave difference of opinion with respect to any portion of this bill it certainly comes with respect to the possibility, if you please, of the Secretary of Labor fixing wages. There is no Member of this House any more opposed to that idea than I am. I say to you frankly that I would not have voted to report such a bill, but there is nothing in this measure that gives to anyone in any executive branch any authority to fix wages. We have had no difficulty in determining what the prevailing rates of wages are under the Bacon-Davis Act. It has been a comparatively simple matter to go into each community in which Government buildings are being constructed, and determine what every particular artisan is paid in that community. The problem is the same here."
[33] Transcontinental & Western Air, Inc., v. Farley, 2 Cir., 71 F.2d 288, 290, certiorari denied 293 U.S. 603, 55 S.Ct. 119, 79 L.Ed. 695. See United States ex rel. Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191; Louisiana v. McAdoo, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506; Morrison, Jr., v. Work, 266 U.S. 481, 485, 486, 45 S.Ct. 149, 69 L.Ed. 394; Wells v. Roper, 246 U.S. 335, 337, 38 S.Ct. 317, 62 L.Ed. 755; International Postal Supply Co. v. Bruce, 194 U.S. 601, 24 S.Ct. 820, 48 L.Ed. 1134; Belknap v. Schild, 161 U.S. 10, 16 S.Ct. 443, 40 L.Ed. 599. See also, Adams v. Nagle, 303 U.S. 532, 540, 541, 542, 58 S.Ct. 687, 82 L.Ed. 999; United States ex rel. Riverside Oil Co. v. Hitchcock, 190 U.S. 316, 325, 23 S.Ct. 698, 47 L.Ed. 1074.
[33a] See Scheer v. Moody, D.C.D.Mont., 48 F.2d 327, 330, reversed on other grounds, 9 Cir., 66 F.2d 1004.
[33b] Bradley v. Fisher, 13 Wall, U.S., 335, 351, 352, 20 L.Ed. 646. See Cooper v. O'Connor, 69 App.D.C. 100, 102, 103, 99 F.2d 135, 137, 138, 118 A.L.R. 1440, certiorari denied 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414. Cf. Johnson v. Lankford, 245 U.S. 541, 38 S.Ct. 203, 62 L. Ed. 460.
[34] Ickes v. Fox, 300 U.S. 82, 97, 57 S.Ct. 412, 81 L.Ed. 525; American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90; Waite v. Macy, 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892; Gegiow v. Uhl, 239 U.S. 3, 36 S.Ct. 2, 60 L.Ed. 114 (habeas corpus); Philadelphia Co. v. Stimson, 223 U.S. 605, 620, 32 S.Ct. 340, 56 L.Ed. 570; Goltra v. Weeks, 271 U. S. 536, 545, 46 S.Ct. 613, 70 L.Ed. 1074; Adams v. Nagle, 303 U.S. 532, 541, 542, 58 S.Ct. 687, 82 L.Ed. 999; Colorado v. Toll, 268 U.S. 228, 230, 45 S.Ct. 505, 69 L.Ed. 927; Lane v. Watts, 234 U.S. 525, 540, 34 S.Ct. 965, 58 L.Ed. 1440; Proctor & Gamble Co. v. Coe, 68 App. D.C. 246, 249, 250, 96 F.2d 518, 521, 522, certiorari denied, 305 U.S. 604, 59 S.Ct. 65, 83 L.Ed. 384:

"The following tests have been used to uphold the exercise of judicial restraint upon executive action under valid laws: (1) Where an officer, insisting that he has the warrant of the statute, is transcending its bounds, and thus unlawfully assuming to exercise the power of government (Philadelphia Co. v. Stimson, supra [223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570]); (2) where an officer attempts to enlarge his power, or to usurp power (Waite v. Macy, supra [246 U.S. 606, 38 S.Ct. 395, 62 L. Ed. 892]); or (3) where his act is based upon a clear mistake of law (American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 109, 110, 23 S.Ct. 33, 47 L.Ed. 90); (4) where the action of the officer or administrative body is clearly beyond its power and in violation of the statute (Interstate Commerce Commission v. Northern Pacific R. Co., 216 U.S. 538, 30 S.Ct. 417, 54 L.Ed. 608. See Lane v. Watts, 234 U.S. 525, 540, 34 S.Ct. 965, 58 L. Ed. 1440; Santa Fé Pacific R. Co. v. Lane, 244 U.S. 492, 497, 37 S.Ct. 714, 61 L.Ed. 1275); (5) where an officer has acted, or threatens to act, in a capricious and arbitrary manner (Commercial Solvents Corp. v. Mellon, 51 App.D.C. 146, 277 F. 548, 550, and cases there cited); (6) where the act of the officer, `under any view that could be taken of the facts that were laid before him, was ultra vires, and beyond the scope of his authority (and) he has no power at all to do the act complained of, he is as much subject to an injunction as he would be to a mandamus if he refused to do an act which the law plainly required him to do.' Noble v. Union River Logging R. Co., 147 U.S. 165, 171, 172, 13 S.Ct. 271, 273, 37 L. Ed. 123; Board of Liquidation v. McComb, 92 U.S. 531, 541, 23 L.Ed. 623."
[35] Goltra v. Weeks, 271 U.S. 536, 544, 46 S.Ct. 613, 70 L.Ed. 1074. See Ryan v. Chicago, B. & Q. R. Co., 7 Cir., 59 F.2d 137, 144, 145; Haskins Bros. & Co. v. Morgenthau, 66 App.D.C. 178, 185, 85 F.2d 677, 684, certiorari denied, 299 U.S. 588, 57 S.Ct. 118, 81 L.Ed. 433. See also, Allen v. Regents, 304 U. S. 439, 444, 58 S.Ct. 980, 82 L.Ed. 1448.
[36] Utah Fuel Co. v. National Bituminous Coal Comm., 306 U.S. 56, 60, 59 S.Ct. 409, 83 L.Ed. 483; Johnson v. Lankford, 245 U.S. 541, 38 S.Ct. 203, 62 L.Ed. 460.
[37] Philadelphia Co. v. Stimson, 223 U. S. 605, 620, 32 S.Ct. 340, 56 L.Ed. 570; Ickes v. Fox, 300 U.S. 82, 97, 57 S.Ct. 412, 81 L.Ed. 525; Payne v. Central Pacific Ry., 255 U.S. 228, 236, 41 S.Ct. 314, 65 L.Ed. 598; Franklin Tp. v. Tugwell, 66 App.D.C. 42, 46, 85 F.2d 208, 212.
[38] See American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 109, 110, 23 S.Ct. 33, 39, 47 L.Ed. 90: "The facts, which are here admitted of record, show that the case is not one which by any construction of those facts is covered or provided for by the statutes under which the Postmaster General has assumed to act, and his determination that those admitted facts do authorize his action is a clear mistake of law as applied to the admitted facts, and the courts, therefore, must have power in a proper proceeding to grant relief. Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law and is in violation of the rights of the individual. Where the action of such an officer is thus unauthorized, he thereby violates the property rights of the person whose letters are withheld."
[38a] 246 U.S. 335, 337, 338, 38 S.Ct. 317, 62 L.Ed. 755: "But the averments of the bill make it clear that defendant was without personal interest and was acting solely in his official capacity and within the scope of his duties. Indeed, it was only because of his official authority that plaintiff's interests were at all endangered by what he proposed to do. * * * And the case does not fall within any of the exceptions to the general rule that the United States may not be sued without its consent, nor its executive agents subjected to the control of the courts respecting the performance of their official duties. It cannot successfully be contended that any question of defendant's official authority is involved; it is a mere question of action alleged to be inconsistent with the stipulation under which it purported to be taken; * * *." [Italics supplied].
[39] Work v. United States ex rel. Rives, 267 U.S. 175, 177, 178, 45 S.Ct. 252, 69 L.Ed. 561; United States ex rel. Goldberg v. Daniels, 231 U.S. 218, 221, 34 S.Ct. 84, 58 L.Ed. 191.
[39a] 266 U.S. 481, 486, 45 S.Ct. 149, 151, 69 L.Ed. 394: "The case at bar is unlike those in which relief by injunction has been granted against the head of an executive department, or other officer, of the government to enjoin an official act on the ground that it was not within the authority conferred, or that it was an improper exercise of such authority, or that Congress lacked the power to confer the authority exercised."
[39b] 2 Cir., 71 F.2d 288, 291, certiorari denied, 293 U.S. 603, 55 S.Ct. 119, 79 L.Ed. 695: "The courts will * * * enjoin acts such as trespass, a step taken beyond the scope of statutory authority or jurisdiction of executive officers, but they will not interfere with matters intrusted by Congress to the discretion of the heads of executive departments of the government." [Italics supplied]
[40] See Adams v. Nagle, 303 U.S. 532, 542, 543, 58 S.Ct. 687, 693, 82 L.Ed. 999.
[41] Philadelphia Co. v. Stimson, 223 U. S. 605, 620, 32 S.Ct. 340, 344, 56 L.Ed. 570; Goltra v. Weeks, 271 U.S. 536, 545, 46 S.Ct. 613, 70 L.Ed. 1074. See also, Truax v. Raich, 239 U.S. 33, 37, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283.
[42] The effective date was postponed until March 1, 1939.
[43] Shannahan v. United States, 303 U. S. 596, 58 S.Ct. 732, 82 L.Ed. 1039; American Federation of Labor v. National Labor Relations Board, 70 App. D.C. 62, 103 F.2d 933, certiorari granted 60 S.Ct. 176, 84 L.Ed. ___. Cf. Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.
[44] American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90.
[45] 246 U.S. 606, 608, 609, 38 S.Ct. 395, 396, 62 L.Ed. 892: "No doubt it is true that this Court cannot displace the judgment of the board in any matter within its jurisdiction, but it is equally true that the board cannot enlarge the powers given to it by statute and cover a usurpation by calling it a decision on purity, quality or fitness for consumption. Morrill v. Jones, 106 U.S. 466, 1 S.Ct. 423, 27 L.Ed. 267. United States v. United Verde Copper Co., 196 U.S. 207, 215, 25 S.Ct. 222, 49 L.Ed. 449. United States v. George, 228 U.S. 14, 21, 33 S.Ct. 412, 57 L.Ed. 712. Again, it is true that Courts will not issue injunctions against administrative officers on the mere apprehension that they will not do their duty or will not follow the law. First National Bank of Albuquerque v. Albright, 208 U.S. 548, 28 S.Ct. 349, 52 L.Ed. 614. But in this case the superior of the appellants had promulgated a rule for them to follow which is alleged to be beyond the power of the Secretary to make. It is said that the appellants are independent of the Secretary and that it is to be presumed that they will decide according to law, as they say in their answer. But if the avoidance of a direct statement as to their intent did not of itself warrant a presumption that they would obey orders, the admissions of their counsel were enough to make their intent to do so plain."
[46] 69 App.D.C. 27, 98 F.2d 308.
[47] 306 U.S. 56, 59 S.Ct. 409, 83 L.Ed. 483.
[48] Shields v. Utah Idaho Central R. R., 305 U.S. 177, 182, 183, 59 S.Ct. 160, 163, 83 L.Ed. 111; Utah Fuel Co. v. National Bituminous Coal Comm., 306 U.S. 56, 59, 60, 59 S.Ct. 409, 83 L.Ed. 483; American Federation of Labor v. National Labor Relations Board, 70 App. D.C. 62, 103 F.2d 933, certiorari granted, 60 S.Ct. 176, 84 L.Ed. ___. See Philadelphia Co. v. Stimson, 223 U.S. 605, 621, 622, 32 S.Ct. 340, 56 L.Ed. 570; Truax v. Raich, 239 U.S. 33, 37, 38, 36 S. Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283; Terrace v. Thompson, 263 U.S. 197, 214, 44 S.Ct. 15, 68 L. Ed. 255; Proctor & Gamble Co. v. Coe, 68 App.D.C. 246, 96 F.2d 518, certiorari denied, 305 U.S. 604, 59 S.Ct. 65, 83 L. Ed. 384, and authorities there cited.
[49] See O'Brien v. Carney, D.C.D.Mass., 6 F.Supp. 761, 762.
[49a] 306 U.S. 118, 137, 138, 59 S.Ct. 366, 369, 83 L.Ed. 543.
[50] This list should be extended to include rights founded on constitutions or treaties which confer privileges. See Asakura v. Seattle, 265 U.S. 332, 44 S. Ct. 515, 68 L.Ed. 1041.
[51] American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90; Scully v. Bird, 209 U. S. 481, 489, 28 S.Ct. 597, 52 L.Ed. 899; Philadelphia Co. v. Stimson, 223 U.S. 605, 620, 621, 32 S.Ct. 340, 56 L.Ed. 570; Lane v. Watts, 234 U.S. 525, 540, 34 S.Ct. 965, 58 L.Ed. 1440.
[52] See International News Service v. Associated Press, 248 U.S. 215, 236, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293; Red Canyon Sheep Co. v. Ickes, 69 App. D.C. 27, 36, 98 F.2d 308, 317: "* * * the right to carry on a business without illegal interference causing irreparable damage is the subject of equitable protection by injunction." See also, Louis Kamm, Inc., v. Flink, 113 N.J.L. 582, 586-590, 175 A. 62, 66, 67; Godin v. Niebuhr, 236 Mass. 350, 351, 128 N.E. 406, 407.
[53] See 38 Op.Atty.Gen. (1937) 555, 558: "It is well established that the invitation for bids on a Government contract must be such as to permit full and free competition, * * *."
[54] See Godin v. Niebuhr, 236 Mass. 350, 128 N.E. 406; 2 Cooley, Torts, 4th Ed., 1932, § 230. Cf. Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 252, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461.
[55] Great A. & P. Tea Co. v. Cream of Wheat Co., 2 Cir., 227 F. 46. Compare the situation when one of the parties has a monopoly. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684.
[56] 38 Op.Atty.Gen. (1937) 555, 557.
[57] 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90.
[58] 239 U.S. 3, 36 S.Ct. 2, 60 L.Ed. 114.
[58a] 246 U.S. 606, 38 S.Ct. 395, 62 L. Ed. 892.
[58b] 69 App.D.C. 27, 98 F.2d 308.
[59] Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047, 11 Ann. Cas. 589; Stephenson v. Binford, 287 U. S. 251, 275, 276, 53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721; Atkin v. Kansas, 191 U.S. 207, 222, 223, 24 S.Ct. 124, 48 L.Ed. 148; Heim v. McCall, 239 U.S. 175, 191, 36 S.Ct. 78, 60 L.Ed. 206, Ann. Cas.1917B, 287.
[60] Gegiow v. Uhl, 239 U.S. 3, 9, 36 S. Ct. 2, 60 L.Ed. 114.
[61] American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 110, 23 S. Ct. 33, 39, 47 L.Ed. 90.
[62] Ibid. The principle enunciated in the McAnnulty case has been approved on numerous occasions by the Supreme and Federal courts. Morrison, Jr., v. Work, 266 U.S. 481, 45 S.Ct. 149, 69 L. Ed. 394; Transcontinental & Western Air, Inc., v. Farley, 2 Cir., 71 F.2d 288, 291, certiorari denied, 293 U.S. 603, 55 S.Ct. 119, 79 L.Ed. 695; United States ex rel. Riverside Oil Co. v. Hitchcock, 190 U.S. 316, 325, 23 S.Ct. 698, 47 L. Ed. 1074; Goltra v. Weeks, 271 U.S. 536, 545, 46 S.Ct. 613, 70 L.Ed. 1074; Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 137, 138, 59 S.Ct. 366, 83 L.Ed. 543.
[63] See Shields v. Utah Idaho Central R. R., 305 U.S. 177, 183, 59 S.Ct. 160, 83 L.Ed. 111; Utah Fuel Co. v. National Bituminous Coal Comm., 306 U.S. 56, 59 S.Ct. 409, 83 L.Ed. 483.
[64] Section 2 of the statute provides that any breach of this stipulation shall render the contracting party liable to the United States for liquidated damages, including a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract, and, in addition, shall render the contract subject to cancellation. Section 3 directs the Comptroller General to distribute a list to all government agencies containing the names of persons found to have breached any such representations or stipulations and, unless otherwise recommended by the Secretary of Labor, such persons may not be awarded a government contract for a period of three years. 49 Stat. 2037, 41 U.S.C.A. §§ 36, 37. See Ex parte Young, 209 U.S. 123, 145 et seq., 28 S.Ct. 441, 52 L.Ed. 714, 13 L. R.A.,N.S., 932, 14 Ann.Cas. 764; Philadelphia Co. v. Stimson, 223 U.S. 605, 622, 32 S.Ct. 340, 56 L.Ed. 570; National Remedy Co. v. Hyde, 60 App.D.C. 252, 254, 50 F.2d 1066, 1068; Terrace v. Thompson, 263 U.S. 197, 215, 216, 44 S.Ct. 15, 68 L.Ed. 255; Petroleum Exploration, Inc., v. Public Service Comm., 304 U.S. 209, 218-220, 58 S.Ct. 834, 82 L.Ed. 1294.
[65] Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 82 L.Ed. 638; Red River Broadcasting Co., Inc., v. Federal Communications Comm., 69 App.D.C. 1, 3, 98 F.2d 282, 284, certiorari denied, 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400: "However, it is a well-settled rule of judicial administration that no one is entitled to judicial relief until he has exhausted all prescribed, applicable, administrative remedies." [Italics supplied] Cf. Mallory Coal Co. v. National Bituminous Coal Comm., 69 App.D.C. 166, 174, 99 F.2d 399, 407.
[66] Declaratory Judgment Act, Jud. Code § 274d, 28 U.S.C.A. § 400.
[67] Ætna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-241, 57 S.Ct. 461, 81 L. Ed. 617, 108 A.L.R. 1000; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 325, 56 S.Ct. 466, 80 L.Ed. 688; United States v. West Virginia, 295 U. S. 463, 475, 55 S.Ct. 789, 79 L.Ed. 1546; Putnam v. Ickes, 64 App.D.C. 339, 342, 78 F.2d 223, 226, certiorari denied, 296 U.S. 612, 56 S.Ct. 132, 80 L.Ed. 434: "We think it is clear from any reasonable construction of the acts that the Declaratory Judgment Act has not given the courts jurisdiction over any controversy that would not be within their jurisdiction if affirmative relief were being sought."
[68] Ætna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L. Ed. 617, 108 A.L.R. 1000: "And as it is not essential to the exercise of the judicial power that an injunction be sought, allegations that irreparable injury is threatened are not required."; Nashville, Chattanooga & St. Louis Ry. v. Wallace, 288 U.S. 249, 264, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191.
[69] Stephenson v. Equitable Life Assur. Soc., 4 Cir., 92 F.2d 406; Wallace v. Currin, 4 Cir., 95 F.2d 856, 861, affirmed 306 U.S. 1, 59 S.Ct. 379, 83 L. Ed. 441.
[70] So of a suit "to interfere with its management and disposition of the lands or the funds" which the United States holds in trust. Morrison v. Work, 266 U.S. 481, 485, 45 S.Ct. 149, 151, 69 L. Ed. 394. So of a suit to restrain the use in a post office of leased machines which infringe plaintiff's patent. International Postal Supply Co. v. Bruce, 194 U.S. 601, 24 S.Ct. 820, 48 L.Ed. 1134. So of a suit to set aside an order of the Interstate Commerce Commission refusing an increase of railway mail pay. United States v. Griffin, 303 U.S. 226, 238, 58 S.Ct. 601, 82 L.Ed. 764.
[71] Louisiana v. McAdoo, 234 U.S. 627, 629, 34 S.Ct. 938, 939, 58 L.Ed. 1506.
[72] e.g., International Postal Supply Co. v. Bruce, 194 U.S. 601, 24 S.Ct. 820, 48 L.Ed. 1134; Louisiana v. McAdoo, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506; Wells v. Roper, 246 U.S. 335, 38 S.Ct. 317, 62 L.Ed. 755; United States v. Griffin, 303 U.S. 226, 58 S.Ct. 601, 82 L.Ed. 764.
[73] 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171.
[74] 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764.
[75] 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892.
[76] 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90.
[77] There are cases in some states to the contrary; e.g., Boren & Guckes v. Commissioners of Darke County, 21 Ohio St. 311; St. Landry Lumber Co., Ltd., v. Mayor, etc., of Town of Bunkie, 155 La. 892, 99 So. 687.
[78] Affirmed and appeal dismissed, 65 App.D.C. 150, 81 F.2d 414.

The lack of irreparable injury is not in itself an answer to plaintiffs' demand for a declaratory judgment. Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 264, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191.