## ADAMS, RECEIVER, *v.* NAGLE ET AL.*

No. 123. Argued December 16, 17, 1937. Reargued March 8, 9, 1938.—Decided March 28, 1938.

*Together with No. 124, *Adams, Receiver,* v. *Tobias et al.,* also on writ of certiorari to the Circuit Court of Appeals for the Third Circuit.

*Messrs. Charles E. Wainwright* and *George P. Barse,* with whom *Messrs. Brice Clagett* and *Charles W. Matten* were on the brief, for petitioners on the reargument and on the original argument.

*Mr. Lemuel B. Schofield,* with whom *Messrs. Edward W. Madeira* and *W. Bradley Ward* were on the brief, for respondents on the reargument and on the original argument.

534

MR. JUSTICE ROBERTS delivered the opinion of the Court.

These are stockholders' suits to enjoin the receiver of two national banks from enforcing assessments ordered by the Comptroller of the Currency pursuant to the statute governing the additional liability of shareholders.[1]

The respondents in No. 123 are stockholders of the Penn National Bank and Trust Company of Reading, Pennsylvania; those in No. 124 are stockholders of the Reading National Bank and Trust Company of the same city; and the petitioner is receiver of both banks. The controversy has its origin in a transaction between the two banks and the Farmers National Bank and Trust Company of Reading. The causes of action are identical and it will suffice to outline the allegations of the bill in No. 123. These are:

On February 17, 1933, Penn and Reading were subjected to unusual withdrawals which depleted their reserves and placed both on the verge of insolvency. Due to this condition the two banks on that date entered into an agreement with the Farmers contemplating a consolidation of the three in accordance with Title 12 U. S. C. §§ 33 and 34. The agreement called for a valuation of the assets of the three banks with ensuing recapitalization and for the Comptroller's approval of the terms of consolidation as required by law. It further provided for transfer by Penn and Reading of all their assets to Farmers, with the right to hypothecate and rehypothecate them, and for assumption by Farmers of the liabilities of the transferring banks except that to stockholders, they reserving the right to enforce against their stockholders any statutory excess liability. Farmers was to operate

[1] R. S. § 5151; Act of Dec. 23, 1913, c. 6, § 23, 38 Stat. 273, U. S. C. Tit. 12, §§ 63 and 64.

their banking houses as its branches. On the same day Penn and Reading turned over their assets to Farmers, which mingled them with its own and thereafter dealt with them as its own. There is no assertion that on February 17 the Comptroller knew, or approved, of the agreement and transfer. It is alleged, however, that, by his direction, a supplemental agreement was made February 20, 1933, by which Penn and Reading guaranteed to Farmers that the assets of each would exceed in value its liabilities assumed by Farmers under the agreement of February 17; and that he acquiesced in the continued administration of the affairs of Penn and Reading by Farmers. On February 17 the assets of Penn which were transferred to Farmers had a reasonable market net value of $5,400,000 as against total liabilities of $5,100,000, and the assets of Farmers were of the fair value of $8,000,000 (to which is to be added the stockholders' liability for assessment in the amount of $1,000,000), as against liability to creditors of $9,000,000.[2] The claims of the two banks against Farmers were, at the date of transfer, and still are, more than sufficient, in the ordinary course of liquidation, to pay all of their liabilities without the necessity of an assessment of the stockholders.

Farmers continued to do business with the combined and commingled assets from February 17 to March 18, 1933. Then the Comptroller appointed a conservator who took possession of all of the assets. October 10, 1933, the Comptroller, without notice to Penn or Reading, their depositors, creditors, or stockholders, and without a hearing, ruled that the agreements of February 17 and February 20 were without legal effect and directed that the transfer and delivery of the assets, and the assumption of liabilities thereunder, should be disregarded; and

---

[2] The bill in No. 124 alleges that on the same day Reading's assets exceeded in value its liabilities of approximately $9,000,000.

536

he attempted to allocate among the three banks the assets theretofore transferred and delivered to Farmers. He appointed the same person he had previously named conservator for Farmers to be conservator of the other two banks. October 20, 1933, the Comptroller proposed a so-called plan of reorganization of the three banks which provided for the organization of a new national bank, the issue by it of stock and securities, the pledge of some of its assets to secure a loan from Reconstruction Finance Corporation, a sale of the assets in the possession of the conservator of Farmers to the new national bank, and a division of the proceeds on the basis of thirty-five per cent. to Farmers, twenty-five per cent. to Penn, and twenty-five per cent. to Reading. It is charged that this division was arbitrary and was based on a classification adopted from the report of national bank examiners dated April 24, 1933, and not on the financial condition of the banks as of February 17, 1933, the date of the execution of the agreement, transfer of assets, and assumption of liabilities. The conservator of all three banks, in furtherance of the plan, reconstructed the assets and liabilities of each as of April 24, 1933, made a division thereof amongst the banks, consummated the sale to the new bank, and apportioned the proceeds according to the plan. In so doing, in conformity with the Comptroller's ruling, he disregarded all rights and obligations arising from the agreement of February 17, 1933, and disregarded the claim of Penn, in the amount of $5,100,000, and the claim of Reading, in the amount of $9,000,000, against Farmers. The bills charge that this conduct was arbitrary, and that the Comptroller's ruling respecting the two agreements was beyond the powers conferred upon him by the National Bank Act or other statutory law, was an unlawful assumption of judicial powers not delegated to him by statute, or capable of being so delegated, was in violation of the rights of Penn and Reading, their depositors, other

creditors, and stockholders, and deprived them of their property without due process of law.

After consummation of the plan of reorganization the Comptroller certified that each of the three banks was insolvent and, in October and November 1934, appointed a receiver for each of them. January 15, 1935, he certified that, upon a proper accounting by the receivers of Penn and Reading, and a valuation of the uncollected assets remaining in their hands, it appeared that a 100% assessment was necessary to pay their debts and he accordingly ordered such an assessment. The bills characterize his conduct as a failure, neglect, and refusal to collect the claims of Penn and Reading against Farmers and a consequent failure to comply with the conditions and provisions of the statute authorizing assessments of stockholders, and as "in fraud of the rights" of Penn and Reading, their creditors and stockholders. His ignoring the claims is charged to have been "a grave error of law based upon his unwarranted assumption of judicial power in abrogating, cancelling, and waiving" the claims of Penn and Reading against Farmers, and "adjudicating the private rights and obligations of parties not subject to his power and control," which invalidated the assessments.

The receiver interposed motions to dismiss which were sustained by the District Court. The Circuit Court of Appeals reversed,[3] holding the bills set forth a cause of action since, if their allegations were true, the Comptroller had exceeded his statutory power and acted arbitrarily in ordering the assessments. The importance of the question involved and asserted conflict of decision moved us to grant certiorari.

The petitioner's position is that the agreement and transfer of assets to the Farmers did not effect a statutory consolidation; that the Comptroller was, there-

---

[3] 88 F. (2d) 936.

fore, at liberty to treat all three banks as separate entities for the purpose of assessing stockholders' liability and that stockholders may not, by a proceeding in equity, challenge his official findings as to insolvency and necessity for an assessment. The respondents say the Comptroller's power of assessment is conditioned on a basic or quasi-jurisdictional fact,—that the ordinary resources of a bank have been exhausted,—and, if they have not been, or are deficient only because of the Comptroller's unlawful abrogation of and refusal to require collection of a valid claim sufficient to pay the bank's debts, the assessment is subject to direct attack as in excess of that officer's statutory power, as arbitrary, capricious, and a denial of due process of law. We are of opinion that the assessments were not subject to attack or frustration in these proceedings upon the grounds set forth in the bills.

1. The agreements of February 17 and February 20 did not effect a consolidation in conformity with the National Banking Act so as to constitute the existing stockholders of Penn and Reading, together with the stockholders of Farmers, stockholders of a consolidated bank. The steps requisite to such consolidation were never taken.[4]

2. When the Comptroller took charge of the banks in question he was bound to deal with them, so far as their assets and liabilities were concerned and in respect of stockholders' liability, upon the basis that they were three separate associations. This conclusion is unaffected by the legality and effectiveness of the agreement of February 17, 1933, upon which respondents insist.[5] At most the agreement substituted a new asset—

[4] See U. S. C. Tit. 12, § 33.

[5] Compare *City National Bank* v. *Fuller,* 52 F. (2d) 870; *Wannamaker* v. *Edisto National Bank,* 62 F. (2d) 696, 699; *B. V. Emery & Co.* v. *Wilkinson,* 72 F. (2d) 10, 12.

the promise of Farmers—for the old assets. Respondents do not claim that the contract and the transfer pursuant to it worked a novation whereby the creditors of the transferring banks became creditors of the transferee. So far as the Comptroller was concerned these creditors were still those of the former and entitled to look to their assets for payment.

3. Whether the Comptroller took the view that the contracts and what was done under them were effective to commute the physical assets of Penn and Reading into a chose in action against Farmers, or that the transaction did not so operate but left Penn and Reading owners of their assets so far as they could be identified and segregated, it was not, as respondents suggest, a condition precedent to the validity of his assessment that he should have exhausted the assets of Penn and Reading.

At the argument the position was taken that the Comptroller was without power to lay an assessment until he had gotten in the avails of all the ordinary assets of the banks and that the claims of Penn and Reading against Farmers under the contract of February 17 were such ordinary assets. The conclusion is that until the receiver of Penn and Reading had recovered upon the contract and distributed the proceeds the Comptroller was without power to order an assessment. No decision of any court was cited to support this position, but it was sought to maintain it by reference to an amendment of the National Bank Act of June 3, 1864,[6] offered and adopted in the Senate. The purpose of this amendment was stated to be to "enable the receiver at any time whenever it becomes necessary, to enforce the individual liability; and in case it is not necessary, if the other assets are sufficient, he will not enforce this contingent liability, which is intended as an ultimate security of the

[6] c. 106, 13 Stat. 99.

creditors of the bank." We think the adoption of the amendment in the light of the explanation is far from sustaining the respondents' contention. It has always been recognized that if the assets of a closed national bank are sufficient to answer its liabilities the Comptroller is not to levy an assessment, but to him is confided the determination of the sufficiency of the assets and, if he concludes they are insufficient, it is not only his right but his duty immediately to invoke the contingent liability of the stockholders. This has been the invariable administrative practice and any other would tend to depreciate the availability and the value of stockholders' liability.

4. The question remains whether, if the Comptroller's action arose from mistake of fact or law, the remedy here invoked is appropriate. In establishing the national banking system Congress has invested the Comptroller, an administrative officer, with jurisdiction to appoint a receiver after investigation and a finding that a bank has become insolvent, and to order an assessment up to one hundred per cent. of the par value of the stock against the shareholders to pay creditors' claims if, upon an investigation, he finds that the assets are insufficient to pay the debts. Plainly these are questions for the exercise of administrative discretion. The necessity for vesting this power in an administrative officer springs from the desirability of prompt liquidation. It would be intolerable if the Comptroller's decision could be attacked collaterally in every suit by a receiver against the shareholders to collect the amount of the assessment. It is settled this cannot be done.[7] It would be equally intolerable if stockholders as a class could call upon a court to review the Comptroller's exercise of his discretion. For a court to entertain a suit for this purpose would be

[7] *Kennedy* v. *Gibson*, 8 Wall. 498, 505; *Casey* v. *Galli*, 94 U. S. 673, 681; *Bushnell* v. *Leland*, 164 U. S. 684.

to render nugatory the functions Congress has confided in the Comptroller. It has often been decided this may not be done.[8]

The respondents, however, urge, and the bill charges, that the Comptroller, in ruling that the contract of February 17 should be disregarded, and the receiver, in following this ruling, exceeded their statutory powers and acted arbitrarily and may be enjoined from enforcing an assessment based on the ruling. The contention rests upon a statement in *United States* v. *Knox,* 102 U. S. 425: "Although assessments made by the comptroller, under the circumstances of the first assessment in this case, and all other assessments, successive or otherwise, not exceeding the par value of all the stock of the bank, are conclusive upon the stockholders, yet if he were to attempt to enforce one made, clearly and palpably, contrary to the views we have expressed, it cannot be doubted that a court of equity, if its aid were invoked, would promptly restrain him by injunction." This was said in a case where a creditor sought a mandamus to compel the Comptroller to order an assessment, he having refused so to do on the ground that the very terms of the statute forbade such action. Relying on this expression a number of the federal courts have said that, while an assessment may not be collaterally attacked, it may be avoided by direct attack for "clear error of law, fraud, or mistake." [9] Respondents admit this statement is too broad. Other courts

---

[8] *Liberty National Bank* v. *McIntosh,* 16 F. (2d) 906; *Wannamaker* v. *Edisto National Bank, supra; Meeker* v. *Baxter,* 83 F. (2d) 183; *Davis Trust Co.* v. *Hardee,* 85 F. (2d) 571; *Acker* v. *Hamilton,* 85 F. (2d) 574; *Barbour* v. *Thomas,* 86 F. (2d) 510; *Church* v. *Hubbard,* 91 F. (2d) 406.

[9] See, e. g., *Deweese* v. *Smith,* 106 Fed. 438, 445; *B. V. Emery & Co.* v. *Wilkinson,* 72 F. (2d) 10, 12; *Trustees* v. *Picher,* 90 F. (2d) 741, 743; *United States Nat. Bank* v. *Pole,* 2 F. Supp. 153, 157; *Angeny* v. *Keuper,* 16 F. Supp. 542, 543.

542

have said that the only ground of successful attack is fraud on the part of the Comptroller.[10]  This case presents no such basis for relief.  The bills do not charge bad faith or fraud on the part of the Comptroller.  The averment that his ruling with respect to the contract of February 17 and the consequent action of the receiver were "in fraud" of the rights of Penn and Reading and their stockholders falls far short of any charge of actual fraud.  Indeed no suggestion of such fraud was advanced by respondents either in brief or in argument.

The respondents rely upon decisions holding that a bill in equity or a writ of mandamus will lie to compel an executive officer to comply with the plain mandate of a statute.  These have no application for they deal with a situation wholly foreign to that here presented.  Where a statute vests no discretion in an executive officer but to act under a given set of circumstances, or forbids his acting except upon certain named conditions, a court will compel him to act or to refrain from acting if he essays wholly to disregard the statutory mandate; but if a discretion is vested in him, and he is to act in the light of the facts he ascertains and the judgment he forms, a court cannot restrain him from acting on the ground that he has exceeded his jurisdiction by reason of an error either of fact or law which induced his conclusion.  Plainly, therefore, the respondents are wrong in asserting that as the facts set forth in their bill charge the Comptroller with an error of law, he exceeded his authority.

The respondents further insist that their allegation that the Comptroller's action was "arbitrary," which is amplified and given content by the facts alleged and admitted by the motion to dismiss, requires a decree avoiding the assessment.  The epithet "arbitrary," used in this

[10] *O'Conner* v. *Watson*, 81 F. (2d) 833, 836; *Meeker* v. *Baxter*, 83 F. (2d) 183, 186; *Davis Trust Co.* v. *Hardee*, 85 F. (2d) 571, 573; *Dunn* v. *O'Connor*, 89 F. (2d) 820, 827.

connection, can mean no more than do the other aver-. ments that the Comptroller, in reaching his conclusion, "committed grave error of law" in failing to regard the contract of February 17 as effective. It would be arbitrary, in the proper sense of the term, for an official to act in the teeth of a statute or stubbornly to refuse to act at all where a statute commands action, but where he essays to exercise the jurisdiction conferred upon him, though his errors may be subject to subsequent correction, they cannot be enjoined as an arbitrary exercise of his authority. To hold otherwise would render orderly administrative procedure impossible.

A reference to the situation with which the Comptroller was confronted when his receiver took charge of the banks will serve to demonstrate that a case was presented calling for the exercise of his discretion. The bill asserts that over a substantial period subsequent to the transfer of Penn's and Reading's assets to Farmers these were intermingled with Farmers' assets. It avers that an attempted segregation of assets was made upon the basis of a report of bank examiners dated April 24, 1933, more than two months after the transfer; it alleges that, at the date of transfer, Farmers owed $9,000,000 against which it had assets of $8,000,000 and a possible recovery by way of stockholders' liability of an additional million dollars; it fails to state what the condition of Farmers was when a conservator was appointed for it; what its condition was when a receiver was appointed for it; what its financial status is today. The pleader contents himself with the statement of a conclusion that the "claims" of Penn and Reading against Farmers were, at the time of transfer of their assets, and still are, sufficient in amount to pay all of those banks' creditors. But if the allegation is true, the only conclusion to be drawn from it is that in ordering the assessment the Comptroller erroneously estimated the value of the banks' assets. Whatever may be

thought of the legality of the transfer of assets pursuant to directors' action on the eve of insolvency, the creditors of Penn and Reading were not bound to look to Farmers and might prefer to look to the assets transferred or to so much of them as could be traced. And there well may have been reason for the Comptroller to doubt the legal efficacy of the transfer in the face of creditors' attack. These and other matters were to be considered by him in arriving at an informed judgment as to the availability and value of the assets of Penn and Reading to answer the claims of their creditors. As an exercise of the discretionary power vested in him, the Comptroller's action must be treated as final and conclusive as to the necessity for an assessment.

5. If the Comptroller's decision with respect to the contract of February 17 was erroneous as matter of law the stockholders may or may not have a remedy. But their remedy is not to attack, or seek to evade payment of, the assessment. The collection of the assessment cannot be made to await the outcome of litigation of that question. Moreover, if, as they assert, the Comptroller's judgment is wrong and the assets of Penn and Reading, consisting of their claims under the contract, are sufficient to pay their creditors, the amounts paid pursuant to the assessments will be returned to stockholders in final liquidation. Meantime, however, the creditors, the protection of whose interests is the primary object of the statute, will have been paid and, as is right, reimbursement of the stockholders will await possible realization upon assets which the Comptroller believes insufficient to satisfy the creditors.

The decrees are reversed and the causes remanded with instructions to dismiss the bills.

*Reversed.*

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.