TRI-STATE TRANSIT CO. OF LOUISIANA, INC., *v.* GULF TRANS-
PORT CO.

(In Banc.   March 31, 1947.   Suggestion of Error Overruled May 12,
1947.)

[29 So. (2d) 825.   No. 36270.]

Stevens & Cannada, of Jackson, for appellant.

746

748

Flowers, Brown & Hester and Robert Burns, all of Jackson, and Prime F. Osborn and Y. D. Lott, Jr., both of Mobile, Ala., for appellee.

750

752

Argued orally by **J. M. Stevens**, for appellant, and by **Fred B. Smith** and **Robert Burns**, for appellee.

**Roberds, J.**, delivered the opinion of the court.

Gulf Transport Company, when this matter was heard before the Mississippi Public Service Commission, held certificate rights to operate, and was operating, its passenger busses over State Highway 63, from the Mississippi state line south of Pascagoula to Lucedale, and thence over State Highway 15 to the Tennessee line; from Lucedale over Highway 15 to the Alabama line; from Beaumont to Hattiesburg over State Highway 24; from Bay Springs to Raleigh over State Highway 18, thence to Kosciusko over State Highway 35; from Ackerman to Pontotoc over State Highway 9 by way of Pittsboro; from Philadelphia to Meridian over State Highway 19,

and from Jackson to Crystal Springs over U. S. Highway 51, and thence over State Highway 27 to the south line of Mississippi. It also had such certificate right over State Highway 35 from Vaiden to Kosciusko, and from Raleigh to Collins, but had not exercised such right. It also possessed the right to transport freight over many of the highways of Mississippi, including freight originating at and destined to Jackson, the specification of which routes not being pertinent to the issues here involved. In other words, the general route of the Gulf Transport Company is north and south, its termini being Mobile on the south and St. Louis on the north, and its lines generally parallel the Gulf, Mobile and Ohio Railroad, of which it is a subsidiary. It filed an application under Section 7640, Miss. Code of 1942, with the Public Service Commision of Mississippi asking for issuance to it of a certificate of public convenience and necessity to operate its busses for transportation of passengers over three additional routes in Mississippi as follows: Route 1, from Jackson to Brandon over U. S. Highway 80 with closed doors, and thence to Raleigh over State Highway 18.

Route 2, from Jackson to Forest over U. S. Highway 80 with closed doors.

Route 3, from Carthage to Philadelphia, and return, over State Highway 16.

Tri-State then had such passenger permits over these three routes and filed with the Commission a written protest to its granting the certificates to Gulf.

The Commission granted the permit over Route 3 with closed doors between Carthage and Philadelphia, with certain additional rights of transportation over this route for passengers originating and destined to points east of Philadelphia in the direction of Meridian on Highway 19, and those originating and destined to points north of Carthage on Highway 35. It denied the permits over Routes 1 and 2. From this order Gulf appealed to the Circuit Court of Hinds County. That Court affirmed the order of the Commission as to Route 3, but ordered that

certificates be issued over Routes 1 and 2 with closed doors between Raleigh and Brandon. From that order Tri-State appeals here.

The only question presented on this appeal is whether or not the evidence is sufficient to sustain the order of the Commission under the rules announced by this Court in the cases of Dixie Greyhound Lines, Inc., v. Mississippi Public Service Com. et al., 190 Miss. 704, 200 So. 579, 1 So. (2d) 489; Tri-State Transit Co. of Louisiana v. Mobile & Ohio Transp. Co., 191 Miss. 364, 2 So. (2d) 845; and Tri-State Transit Co. of Louisana, Inc., v. Dixie Greyhound Lines, Inc., 197 Miss. 37, 19 So. (2d) 441, considering, along with the effect of such rules, the powers of the Commission, the matters which it must consider, and the public policy of the State as set out in the statutes.

In the first case this Court [190 Miss. 704, 200 So. 581] said the test is "whether the Commission in arriving at its determination departed from the applicable rules of law and whether its finding had a basis in substantial evidence or was arbitrary and capricious."

In the second case the Court said [191 Miss. 364, 2 So. (2d) 847], "the sole question presented to us for decision is whether or not the action of the Commission was arbitrary, not supported by substanial evidence, or was manifestly against the evidence."

In the third case this Court said [197 Miss. 37, 19 So. (2d) 443], "the reviewing court cannot substitute its judgment for that of the Commission and disturb its finding where there is any substantial basis in evidence for such finding or where the ruling of the commission is not capricious or arbitrary."

Gulf urges in this case, in an unusually strong presentation, that there is no substantial evidence in this record supporting the denial of the Commission of the permits over routes 1 and 2 and that the action of the Commission in so doing was arbitrary and capricious.

The order of the Commission, in part, recites: "The Commission, in determining this cause, has taken into

conisderation the provisions of law authorizing the Commission to establish reasonable requirements with respect to reasonable and adequate service, and the statutory provisions authorizing the Commission to supervise and regulate the schedules of common carriers by motor vehicles, and making motor carriers subject to the control, supervision and regulation of the Commission. . . . In determining whether the application as to Route One and Two should be granted or denied, and in concluding that said application should be denied as to Routes One and Two, and in determining that the application should be granted in part as to Route Three with the restrictions above mentioned, the Commission has given due consideration to the present transportation facilities over the proposed routes, and to the certificate rights of the Tri-State Transit Company of Louisiana, Inc., as an existing carrier, the volume of traffic over said routes, the financial condition of applicant, and the condition of the highways, . . ."

It then finds that as to the route between Jackson and Raleigh the schedules of Tri-State are adequate and sufficient for the transportation needs on said route, and that as to the route between Jackson and Forest Tri-State is operating 12 busses per day each way, and that this schedule was fully adequate to meet the demands of the traveling public and that there is no need for additional service between said points "as shown by the undisputed testimony before this Commission, and as shown by the frank admissions of applicant's counsel at the hearing." The order of the Commission further recites: ". . . that there is no volume of bus traffic which would justify the proposed operations over Routes One and Two; that the evidence shows that there are a comparatively small number of passengers interchanged between the lines of the two companies at their junction points, especially when the number of schedules is taken into consideration." And that there is no necessity for duplication of franchise rights, and finally "the Commission finds, in

brief, that the application as explained by the applicant's officers and attorneys at the hearing, if granted would necessarily sanction the principle that duplication of certificate or franchise rights could be granted all of the major bus lines, contrary to the regulatory statutes as interpreted by the Supreme Court of Mississippi, and that the proper remedy for inconveniences at junction points is a better correlation and coordination of schedules in preference to the principle of duplicating franchise rights and burdening the highways with excessive equipment.''

The hearing before the Commission consumed approximately two weeks time during which 132 witnesses testified, of which number 95 were witnesses for the Gulf and 37 for Tri-State, including certain officials of the respective corporations.

The substance of the testimony of the lay witnesses for the Gulf was that in their opinion additional passenger transportation facilities were needed into Jackson, Mississippi, from the northeastern and southeastern parts of this State; that this would make it more convenient for people in those sections to come to the state capital and that it was inconvenient to make bus changes from the lines of the Gulf to those of Tri-State, necessitating some delay in making the bus changes, and that it would be a convenience to the traveling public, both from a business and social standpoint, to have the additional transportation facilities. The record discloses, however, that in reaching their conclusions many of these witnesses were under the impression that if the additional facilities were provided they would be able to remain on the same bus from the point of entrance of the bus until they arrived at Jackson. A number of the resolutions of the supervisors and of the municipal boards expressly so stated. It is shown, however, by the testimony of the Gulf officials that it would be impractible and not economically possible for that to be done. What the Gulf proposed to do, according to its officials, was to transfer its Jackson passengers to their own busses at certain points, the main

ones of which would be Louisville and Laurel, and run special busses into and out of Jackson carrying these passengers. Of course, whether that plan could be economically adopted would depend upon the number of passengers into and out of the City of Jackson. It is, of course, clear that busses carrying passengers originating on the line of Gulf in the northeastern part of the State destined to points in the southeastern part of the State and beyond, and vice versa, could not be diverted from Highway 15 into Jackson and then back to Highway 15 to proceed to carry such passengers to their destination. This would involve for such passengers a delay of several hours and unnecessary distance of many miles. This assumption of one-bus transportation to and from Jackson on the part of the lay witnesses and the county and municipal boards lessens considerably the force and effect of their evidence and their conclusions.

On the other hand, the substance of the testimony of the lay witnesses for Tri-State was they thought the present service being rendered by Tri-State was sufficient for the needs of people in their respective communities coming to and returning from the City of Jackson, and that the aditional service was not needed, taking into consideration the condition of the highways, the amount of traffic and the existing schedule of Tri-State.

The officials of Gulf, in substance, explained the proposed service, the existing and prospective revenue from operations and the schedules they had hoped to adopt and the financial condition of that corporation.

The officials of the Tri-State explained the existing schedules, the amount of transportation and the financial condition of the company. They further testified that no complaint as to the service had been made to it and that it had not been requested by the Commission to add additional busses or to change its schedules for more convenient transfer at its connections with busses of the Gulf Company. They said they were prepared and ready to add such additional busses and make changes in their

schedules as the Commission might request in order to more conveniently serve the people coming to Jackson, Mississippi, in making transfers from busses of one company to busses of the other.

It was furthermore shown that Tri-State connects at 12 different points along the route served in Mississippi by Gulf, counting as two connecting points Hattiesburg and two at Laurel, from which points there are two routes into the City of Jackson. At the time of the hearing the Tri-State was furnishing each way each day in and out of Jackson from and to these connecting points a total of 63 busses. For instance, from Hattiesburg there were 8 busses each way per day; from Laurel by way of Magee and from Laurel by way of Raleigh there were 6 each way per day; from Newton and Forest, which are perhaps the main interchange points between the two companies, there were 12 each way per day.

The record further discloses that, with one or two possible exceptions, the distances from the present junction points over the existing routes of Tri-State to Jackson is less than would be the distance to Jackson from proposed interchange points by Gulf to its own busses and over its desired routes to Jackson.

It was also shown that the number of passengers which have been delivered in the past by Tri-State to the Gulf at the present interchange points was considerably greater than the number which had been delivered by Gulf to Tri-State destined to the west, including, of course, the City of Jackson.

It is furthermore disclosed that at most of the interchange points the two bus companies use a common depot.

A fair analysis of the testimony reduces itself mainly, we think, to three principal grounds for issuing the permits:

First, that Gulf would be in a position to issue to and from Jackson interchangeable tickets with the Gulf, Mobile & Ohio Railroad;

Second, it would undertake to have busses present at designated points into which Jackson passengers might transfer more quickly and with less inconvenience than can now be done from such busses to those of Tri-State, and

Third, Gulf would have transportation facilities into Jackson, the capital of the State.

As to the first ground, this Court said in Tri-State Co. of Louisiana, Inc., v. Mobile & Ohio Transp. Co., 191 Miss. 364, 2 So. 2d 845, that, while this was a matter to be considered, it is not controlling.

As to the second ground, it is by no means certain that the revenue from Jackson passengers would justify having a bus standing ready to receive passengers and make special trips to transport them to and from Jackson. That would depend upon the number of passengers; besides, these Jackson passengers would naturally be on different busses arriving at different times, north and south, on Highway 15. To eliminate delay in tranfer it would seem necessary that Gulf must needs have a Jackson bus standing ready as each bus on Highway 15 arrived at the interchange point. With the existing number of east and west busses of Tri-State, crossing and connecting with the lines of Gulf, it would appear much more feasible to eliminate delays in transfer by using Tri-State busses than the proposed system of using Gulf busses. Furthermore, Tri-State has offered to add busses and rearrange its schedules and depots and to co-operate with Gulf so as to comply with whatever order the Commission may think necessary to remedy this situation.

As to the third ground, our Motor Carrier Act, Code 1942, Sec. 7632 et seq., is patterned largely after the Federal Act. 49 U. S. C. A. Sec. 301 et seq. In refusing the application of Missouri Transp. Co. to operate from Natchez to New Orleans (2 M. C. C. 556, 9 M. C. C. 712), mainly to have a gateway to a large city and to avoid delays and inconveniences of transfer to another bus line at Natchez, the Interstate Commerce Commission held

that inconvenience of transfer and the desire to reach a large city, were not grounds for issuing duplicate permits. It gave effect to the same principle, as applied to entrance into a large city, in refusing an application of Tri-State Transit Company from Holly Springs, Miss., to Memphis, Tenn., which would have duplicated a route being served by Dixie Greyhound Lines. (11 M. C. C. 285). If the desire to reach a large terminal is to control, where the route thereto is already being adequately served, then Tri-State in this case would have good argument for seeking a duplicate permit over highway 15 into Mobile, now being served by Gulf.

These questions were all duly considered by the Commission along with many others.

The statute requires that the Commission in passing on these questions shall consider certain matters and prescribes the public policy of this State. Section 7633, Code 1942, reads:

"It is hereby declared to be the policy of the legislature to regulate motor carriers in the public interest to the end that the safety and welfare of the public in its use of the highways and of the transportation agencies by motor vehicle used thereon may be practiced; that the property of the State in its highways may be protected from unreasonable, improper and excessive use; that the inherent advantages of highway transportation may be recognized and preserved; that sound economic conditions in such transportation and among such carriers may be fostered; that the service by motor carriers may be adequate, economical, and efficient; that reasonable charges may be made therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; that relations between motor carrier and other carriers may be improved and coordinated; and that cooperation may be maintained with the governments of the United States and the several States, and with their duly authorized officials in carrying out the purposes and provisions of this Act. This Act shall apply

to persons and motor vehicles engaged in interstate commerce to the extent permitted by the Constitution of the United States and as provided herein.''

Section 7637, Code 1942, confers upon the Commission extensive powers and duties in regulating common carriers of passengers and freight over the highways of the State of Mississippi and in granting or refusing permission to use such highways and in making rules and regulations governing such transportation.

Section 7642, Code 1942, reads as follows: ''In determining whether the certificate required by this Act shall be granted, the Commission shall, among other things, give due consideration to the present transportation facilities over the proposed route of the applicant, the volume of traffic over such route, the financial condition of the applicant, and the condition of the highway over the proposed route, or routes.''

Having in view then the testimony disclosed by the record, the rules under which this Court has announced it will or will not disturb the finding of the Commission, the powers and duties of the Commission, and the public policy of the State, we think it cannot be said that the action of the Commission in this case was without substantial evidence to support it, or that such action was capricious and arbitrary.

It is at once evident that the Commission is in much better position than is this Court to pass upon such matters. It has before it the highway and transportation situation of the entire State. It has its facilities for acquiring information pertaining to such entire system and it is able to fit into that system particular cases which may come before it. This Court has not before it the over-all state picture of the needs and adequacy of present transportation facilities, the condition of the highways and the amount of travel thereover, so as to enable it as efficiently as the Commission to determine the various questions arising under this intricate system.

The Commissioners hold their offices by authority of the qualified electors of their respective districts and represent the interests of the entire people of the State within the powers conferred upon them by the legislature and to that end the legislature has conferred upon them extensive authority over traffic and transportation upon the highways of the State. It is but natural that individuals desire frequent passage of busses by or near their homes or places of business; they view the questions mainly from the standpoint of self-interest and self-convenience, but the Commission must at one view consider the entire public need, the condition of the highways, the extent and hazards of travel, especially the danger caused by large busses frequently stopping along the highways to discharge and take on passengers, the economic situation, cost to the public, the financial condition and ability of public operators to render proper service, and many other questions.

However much this Court, or any member thereof, may differ with the conclusions of the Commission, or doubt the wisdom of its action, we should not substitute our judgment therefor and reverse such action unless it is beyond the powers of the Commission, or not supported by substantial evidence, or is arbitrary or capricious.

As illustrative of the wisdom of not disturbing the action of the Commission, except under the conditions above stated, the hearing of this case was had in December, 1944, while World War II was in progress. The matters were considered in the light of the war conditions then existing, having in mind the vigorous prosecution of the war, the use of the highways of the State for that purpose, the safety of the traveling public, the conservation of rubber and other war materials, and the various other questions and problems then confronting the government in prosecuting the war. Conditions then were materially different from what they are now.

As stated, no complaint has been made to the Commission of inadequacy of service by Tri-State from

junction points with the Gulf for passengers in and out of the City of Jackson, and Tri-State proposes to rearrange its schedule and facilities-at junction points, as the Commission may order, for more convenient changes and connections for passengers received by it from Gulf to be transported to and from the capital of the State.

Considering all of the foregoing problems and questions we are of the opinion the order of the Commission should not be disturbed, but, on the contrary, should be reinstated.

It is so ordered.

### Dissenting Opinion.

**L. A. Smith, Sr., J.,** delivered a dissenting opinion.

With deference, I disent from the views of my associates in this matter. Respectfully, I submit my views.

For convenience, I shall refer to the appellee as "Gulf", and to the appellant as "Tri-State."

Gulf operates in Mississippi from Walnut in Tippah County, near the Tennessee line, to a point on the Alabama line near Lucedale on Highway 15, and from Lucedale to Pascagoula on Highway 63. It has a franchise also from Kosciusko to Raleigh, and from Raleigh to Bay Springs on Highway 15. It has no entry into Jackson except from the south, starting at a point on the Louisiana line below Tylertown, proceeding north through Monticello and Crystal Springs into Jackson. It applied to the Public Service Commission for certificates of convenience and necessity to permit its operation of busses from Forest through Brandon to Jackson; and from Raleigh through Brandon to Jackson; and also from Philadelphia on Highway 15, where it has a franchise to Carthage on Highway 35, on which highway it also has a franchise. Over these routes Tri-State already has a certificate. Gulf proposed to operate with closed doors from Forest

on Highway 35 to Jackson, and from Raleigh to Jackson, but with open doors between Carthage and Philadelphia.

The Public Service Commission refused all certificates, except that it granted a permit to operate with closed doors between Carthage and Philadelphia, traversing Highway 16 between Highway 15 and 35. On appeal to the circuit court from the order of the Commission, the action of the Commission was reversed by the circuit court and it was ordered to issue certificates of convenience and necessity to Gulf in accordance with its application, except all Gulf busses over all of these routes were to be operated with closed doors. From that judgment, Tri-State appealed here.

The Gulf operates 1,864 route miles of truck lines, of which 962, or 52%, are in this State. Gulf also operates 1, 419 route miles of bus lines, of which 813, or 58%, are in Mississippi. It operates 1,952 route miles by rail lines in seven states, of which 906, or almost 50%, are in Mississippi. Its bus lines on Highways 15, 9 and 35, from which it sought entry into Jackson, as aforesaid, serve more than a score of counties in Mississippi with more than three-quarters of a million people as inhabitants thereof, and it was to serve their convenience and necessity in traveling to Jackson primarily that Gulf sought this certificate of cenvenience and necessity. Of course, Gulf may be assumed to also have had in mind a reasonable pecuniary return.

Unfortunately, the application of Gulf was misunderstood almost at the beginning of the hearing before the Commission. The case seems to have been tried on the theory that Gulf proposed to furnish a single bus service, whereas in fact their proposal was to furnish a single line control service, from the territory defined, into and out of Jackson. A "single bus service" implies that a passenger might board a Gulf bus anywhere on its certificated routes and without leaving the bus be carried into Jackson, while a "single line control service" means transportation service under a single management. The latter

is what was offered to be furnished by Gulf, and the confusion between the two seems to have affected materially the conclusion of the Commission. The chief executive officer of Gulf testified that a "single line service" is "service under one handled control; we couldn't say that in every instance we could start a bus out of every point on our line and run it direct to all terminals on our line, there might be changes of equipment necessary; a bus from the north scheduled from Walnut to Jackson, Mississippi, it might be necessary to change equipment at Louisville; that is a physical change of buses; it don't involve the passenger; the passenger will have an empty bus waiting at Louisville." This, Gulf argued, would be a great convenience as the inconvenience to thousands of people who frequently miss connections at junction points between Gulf and Tri-State would be averted. It would also avoid delay occasioned by passengers being compelled to await the arrival of busses from Tri-State on different schedules, and would also avoid any inconvenience of baggage handled by two companies.

The junctions, or, as called by a Gulf witness, "contacts," between Tri-State and Gulf on the routes involved are Pontotoc, Houston, Mathiston, Ackerman, Philadelphia, Newton, Forest, Raleigh, Hattiesburg, Carthage and Kosciusko. The witness also called these places "interchange points." Gulf argues that to get to Jackson from northeast and southeast Mississippi involves many interchanges between Gulf and Tri-State avoidable under their proposal.

Gulf contended that they would serve a northeastern route from Jackson, having a total of 279 miles, of which the duplication over Tri-State would be only 70 miles. The southeastern route would have a total length of 208 miles, of which the extension, with duplication, would be for only 49 miles, and the bus service would improve in more than a score of counties having a total population of more than 700,000 people, as stated supra. The record supports the claim of Gulf, in my opinion, that there

would be sufficient volume of traffic to support the through routes for which they applied, the minimum estimated revenue for these lines being 40c per bus mile and the cost of operation being only 27c per bus mile. I think Gulf maintained its point, that it is fit, willing and able properly to perform the services proposed, and is qualified to do so, as specified in the statute involved.

In the trial before the Commission, Gulf introduced numerous witnesses, including a college president, bank officials, wholesale merchants, a chamber of commerce employee, former and present public officials, a labor union executive, lumbermen, manufacturers, merchants, lawyers, legislators, judges, civic leaders and business men, school superintendents, and representatives of business interests generally. Tri-State introduced a much smaller number of witnesses, including some public officers and business men but generally its witnesses had had only limited opportunities for observation and appraisement of the situation. It must be conceded that all of the witnesses were men of character and intelligence, but to me it seems that the greater opportunity of observation and experience of the witnesses for Gulf should have had a more effective weight in the decision in this matter by the Commission than apparently it had.

Gulf argued that the public convenience and necessity demands the service as proposed, especially as there is no train service into Jackson from southeast and northeast Mississippi; and that conditions at Laurel, Philadelphia and Ackerman would be substantially relieved. Gulf proposed three schedules each way per day without change from Louisville and Pascagoula, and the evidence seems overwhelming that this additional service is needed. Gulf has an interchange arrangement with the Gluf, Mobile & Ohio Railroad Company whereby tickets would be interchangeable for passengers on either a Gulf bus or train. Gulf contended, reasonably enough, that the Tri-State selfishly fights the granting of its applications for these certificates of convenience and necessity for

fear it will lose revenue, and hence the controversy is between Tri-State and the public involved, which public overwhelmingly attested the merits of Gulf's application. It was also argued, on behalf of Gulf, that since Jackson is the center of the State and its capital, every facility making it more convenient for people from all parts of the State is a public convenience and necessity. They argued that connections between the two lines at various points are bad, which the Gulf would correct if granted the franchise sought, because it would eliminate all changes from Pascagoula to Jackson and substitute only one change from Walnut to Jackson, which would be perhaps at Louisville.

Gulf argued that the Commission misconceived the law, and found against the overwhelming weight of the evidence, contending that duplication of franchises had been permitted under the policy of the Commission in proper cases frequently, and has many precedents in Mississippi and should be followed since public convenience and necessity is the proper controlling factor. It was contended that granting the certificate sought by Gulf, the weakest of the four big bus companies in Mississippi, having the poorest routes, could not injure Tri-State, which uses the most important highways in Mississippi, and that the resulting competition, if any at all, would be trivial and indirect. Gulf argued that the new traffic generated along the proposed new lines, from their present franchises, into Jackson, would concentrate travellers into Tri-State lines leading in all directions out of Jackson, and thereby improve Tri-State business, thus materially enhancing the public convenience and necessity of the whole travelling public. The result would produce benefit, rather than detriment, to the operations of Tri-State. Gulf argued also that the law does not grant the Commission a free hand to issue or refuse certificates, at its pleasure. Its function is not a matter of grace, but of justice.

On the other hand, Tri-State argued that a "single bus service" is the object of the application and cannot be attained. It argued also that since Tri-State has permits over all routes involved, to grant the application of Gulf would be a duplication in areas where it handles the traffic satisfactorily because of the intersections at the points named. It relies upon the cases of Tri-State Transit Company of Louisiana, Inc., v. Dixie Greyhound Lines, Inc., 197 Miss. 37, 19 So. (2d) 441, and Dixie Greyhound Lines, Inc., v. Mississippi Public Service Commission et al., 190 Miss. 704, 200 So. 579, 1 So. (2d) 489. The record contains resolutions by various civic bodies and public boards in the counties involved, urging upon the Public Service Commission the necessity of granting Gulf the certificate sought in order to serve the convenience of the public. Tri-State argued that these resolutions were adopted on the assumption that there would be a "single bus service," which cannot be maintained. Tri-State also said that they will have busses available for changes from Gulf to their busses at intersections, and will otherwise adjust schedules and connections as the Commission thinks best. I have examined the resolutions by the civic groups and public bodies, and it does not seem to me that they were based primarily on the idea advanced by Tri-State here; and that Tri-State having a large interstate business, with busses coming from distant points beyond the State of Mississippi, and passing through to other distant points also beyond Mississippi, might find itself practically unable to adjust its interstate schedules to accommodate local traffic as they propose.

Tri-State further contended that its service is adequate; and without complaint, which seems to be rather naive, since so many interested people in northeast and southeast Mississippi are complaining here that the service of Tri-State is not adequate. However, it argued that a witness, an official of Gulf, admitted that Tri-State takes care of all local needs, but since Gulf would operate, if granted the certificate, with closed doors, it would not

appear that Gulf seeks to invade the local patronage of Tri-State. Tri-State argued also that, if granted the franchise sought, Gulf would take business away from it. It seems hardly possible that, with closed doors, Gulf could get much passenger service along the proposed duplicated routes. Tri-States cited the legislative policy that "the property of the State in its highways may be protected from unreasonable, improper and excessive use; that the inherent advantages of highay transportation may be recognized and preserved; that sound economic conditions in such transportation and among such carriers may be fostered; that the service by motor carriers may be adequate, economical, and efficient; that reasonable charges may be made therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; that relations between motor carriers and other carriers may be improved and coordinated; . . ." Section 7633, Code 1942. It contended that this declared policy supports its objection to the granting of the franchise to Gulf. It seems to me, however, to be a strong plea in favor of Gulf, rather than against it. Tri-State argued that its route from Pascagoula to Jackson is the most direct route, and denied that delay, because of missing connections, is bad. Tri-State declared it delivered six times as many passengers to Gulf at Laurel as Gulf to Tri-State, which is, no doubt, approximately accurate, on account of the interstate connections of Tri-State, but is no argument to refute the idea of northeast and southeast Mississippi that they need the service Gulf seeks permission to render them.

In Pan American Bus Lines Operation, 1 M. C. C. 190, 203, it was said that: "The question, in substance, is whether the new operation of service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed

without endangering or impairing the operations of existing carriers contrary to the public interest.''

In Tri-State Transit Company of Louisiana v. Dixie Greyhound Lines, 197 Miss. 37, 19 So. (2d) 441, this Court said that: ''In proceedings on application of motor carrier for additional certificate of public necessity and convenience, the Public Service Commission's findings are prima facie correct and reviewing court cannot substitute its judgment for that of Commission and disturb its findings where there is any substantial basis in evidence for such findings or where ruling of Commission is not capricious or arbitrary.'' However, this Court also said in the same opinion: ''The evidence for the Dixie Company tended to show that the public convenience and necessity would be promoted by granting the franchise it applied for. The evidence for the Tri-State Company, which was substantial, tended to show the contrary.'' In the case at bar, it seems to me that the evidence for the Gulf is so overwhelming that by comparison the evidence for the Tri-State does not reach a sufficient degree to be substantial, and by this Court's own formula, this franchise should have been granted. The rule is announced in the Dixie Greyhound Lines v. Mississippi Public Service Commission case, supra, as follows: ''That a court of competent jurisdiction has the power to review any order made by an administrative commission to determine whether it is supported by substantial evidence, within the meaning of that term, as herebefore defined, or is purely arbitrary and capricious, beyond the power of the commission to make, or violates some statutory or constitutional right of an interested party.'' But, in the opinion, the Court also said, dealing with duplicating certificates, that ''we do not think that the permission granted . . . can be said to be without substantial evidence to support it, or that it was manifestly against the evidence; nor are we able to say that such action constituted an unwarranted infringement of the existing franchise.'' I direct attention especially to the clause ''or that it was manifestly

against the evidence," and inability of the Court to say that "such action constituted an unwarranted infringement of the existing franchise." The rule in the Tri-State Transit Co. of Louisiana v. Dixie Greyhound Lines case, 197 Miss. 37, 19 So. (2d) 441, that simply because the protestants, Tri-State, had some substantial evidence, the finding of the Commission would not be disturbed, in my judgment, endows the Commsision with to much power, and in cases like the one at bar, where its order is "manifestly against the evidence," its action should be reversed.

The Supreme Court of Rhode Island in Abbott v. Public Utilities Commission, 48 R. I. 196, 136 A. 490, 491, held that in statutes requiring issuance of certificate of public convenience and necessity by Public Utilities Commission for operation of motor bus line, the meaning of "conveience" is not its colloquial sense as synonymous with "handy" or "easy of access," but in accord with its regular meaning of "suitable" and "fitting" and "public convenience" and refers to something fitting or suited to public need. The Court said further that: "The word 'necessity' in the expression under consideration does not have reference to an indispensable necessity, but rather that the route in question appears to the commission to be reasonably requisite."

The New Jersey Court in Re Washington Avenue in Burrough of Chatham, 139 A. 239, 240, 5 N. J. Misc. 858, held that public necessity means need for reasonable convenience, facility and completeness in accomplishing a public purpose.

The overwhelming weight of the evidence in this case that the public convenience and necessity of approximately one-third of the people in Mississippi, in more than a score of counties, would be served by granting the proposed certificate to Gulf, required the Commission to grant it even within the strictest of the foregoing formulae, which this Court has prescribed for review of the orders of administrative boards. To designate the

Commission's failure to do so as arbitrary within this rule, is no more a reflection on their reaction to the evidence than it is to characterize the judicial process as erroneous because of making a wrong adjudication. In the one case the result is "arbitrary," in the other it is "erroneous." So that, where this Court speaks of an order of the Commission being "manifestly against the evidence," it would be tantamount to saying that such order would be arbitrary. I think the scales, by which the people's needs and the Commission's power are to be balanced, require at least restraint in the exercise of the Commission's power to deny a franchise where, as here, such a numerous train of witnesses, people in position to survey and appraise the situation, whose efforts have developed their own communities, and whose experience in public affairs qualifies them to speak convincingly, so forcibly testify that public convenience and necessity require that it be granted. After all, successful conquest of the problems of life in the attainment of position "on the mountain top" does afford a vantage point of observation, which should challenge pondering in any deliberative body. In my opinion, failure of the Commission here accurately to appraise the comparative force and power of the evidence on both sides, in proper proportion to its respective probative weight, resulted in its decision becoming arbitrary.

It is difficult to define public convenience and necessity in such proper generic terms that such definition will fit every situation, so various are the circumstances involved in different conditions. However, it seems to me that, while an apt general definition may indeed be elusive or even fugitive, in the case at bar we have a fitting specific illustration of the meaning of the phrase, which the facts of this record disclose. When citizens from all of the vast territory involved, representing nearly a million people, ranging from potential to actual travelers to and from their chief commercial and industrial city; the headquarters of all major political campaigns for State office;

also headquarters for many religious groups in the State; the place for holding of numberless conventions; the seat of the Government; with which the citizen must often make contact among various boards, commissions and bureaus, and where may be found the different State officials, including the Governor; and where the Supreme Court sits,—all of which so often makes it necessary for such travel to and from Jackson,—should compel the conclusion that whatever contributes to the comfort, the expeditiousness, the economy, the safety, and freedom from travel vexations and delay on these trips, naturally ministers to the public convenience. Therefore, it seems to me, here we have a valid demand of public convenience under circumstances of necessity, and its denial cannot be classed as less than arbitrary.

In this record are numerous resolutions signed by many prominent members of civic organizations and public boards, which have been mentioned ante. They were admitted before the Public Service Commission without objection and we have considered them here, but respectfully I insist that they have not received the weight to which they are entitled. They were treated properly as competent testimony before the Commission, where common-law rules of evidence are much relaxed and not followed to any great extent, but too little importance has been attached to them both there and here. In a footnote to his article on Rules in Administrative Tribunals, Mr. Wigmore, Vol. 1, p. 39, quotes from the digest of decisions under the Interstate Commerce Act by Lust as follows: "It is perhaps not too much to say that not a single case arising before the Commission could be properly decided if the complainant, the railroad, or the Commission, were bound by the rules of evidence applying to the introduction of testimony in courts." Wigmore lays down the rule that the policy of the legislatures and the courts is to free public service commissions from the usual common-law or statutory rules of evidence. Therefore, these resolutions, by groups or representative local

citizens, are matters demanding great consideration, in my judgment, as the boards adopting them comprise spokesmen of the best business and political interests of their respective communities. But, it is said that these resolutions are motivated by the impression that Gulf offers ''a single bus service'' instead of what in fact it was offering ''a single line control'' service. I do not think this is correct, as witness the following quotations from typical resolutions. For instance, the citizens of Mantee requested a ''direct one line service to our State Capital''; the Louisville Rotary Club said: ''This area is without adequate public transportation into the State Capital of the State of Mississippi, and this Rotary Club is made up of men representing the various interests of the City of Louisville and 'direct transportation' is sought''; the Mayor and Board of Aldermen of Louisville want ''additional transportation facilities into the Capital of the State''; the Mayor and Board of Aldermen of Noxapater concern themselves with additional facilities, complaining of time lost under the present situation; the Supervisors of Leake County say that public convenience and necessity require the operation of a double, single line bus service into and out of Jackson and that present facilities are grossly inadequate.

The Interstate Commerce Commission, speaking of changing from one line to another with differing schedules, 31 M. C. C. 317, said: ''We have no difficulty in arriving at the conclusion that the necessity of making such frequent changes of busses, and the consequent delays incident thereto, has been a handicap to the development of passenger transportation over this route.'' It will be remembered that in this case Gulf said that the probability is that the only change of busses will be at Louisville on the northeastern end of the route, and that there its empty bus would be waiting to receive immediately passengers for transfer.

It is true that Tri-State would lose the custom of the transferred passengers conveyed by Gulf to the inter-

change points, and that such competition would be substantial, as forecasted by the evidence of the public travelling need to have it handled more conveniently. However, as pointed out elsewhere herein, there would be no local competition. But the public convenience and necessity of the people should be the dominant consideration, even to the extent of causing loss of business to one carrier by granting a certificate to another carrier, where great improvement of service to the public will ensue.

The right to use the highways of this State belongs to the people and not to any common carrier. In a case when a large proportion of the most successful and informed citizens of northeastern and southeastern Mississippi contributed an overwhelming weight of testimony to the hearing of an application by the Commission as here; asserting that public conveniences and necessity required that the public highway be used for this proposed new service, it strikes me that the tremendous weight of this testimony, especially when compared with the evidence of lesser weight offered by the protesting Tri-State, rates the Commission's refusal to grant the certificate as arbitrary.

A danger in the present situation is the hazard of developing monopolly in a bus line over so many Mississippi highways. Such monopoly could conceivably throttle substantially the development of bus transportation in this State, and hence to foster competition in the situation here before us would be beneficial instead of detrimental to the public, whose interests are so vitally involved. In the instant case, however, there could be no local competition over the debated route on account of closed busses by Gulf. But, conceding that there would be, competition brings about cheaper prices and better service. This is recognized by the Mississippi Motor Carrier Act of 1938, Section 7636, Code 1942, where it is provided: "Nothing in this Act shall confer any proprietary or property rights in the use of the public highway."

Section 7641, Code 1942, provides: "If the Commission shall find the proposed operation justified, and that the applicant is fit, willing and able properly to perform the services proposed and to conform to the provisions of this Act and of the requirements, rules and regulations of the Commission, it shall issue a certificate to the applicant, subject to such terms, limitations and restrictions as the Commission may deem proper, authorizing in whole or in part the operations covered by the application. If the Commission shall find the proposed operation not justified the application shall be denied."

What Gulf is seeking is through travel on its own lines to passengers desiring to enter and to leave Jackson. Of similar service the Interstate Commerce Commission in Santa Fe Trail common carrier application, 21 M. C. C. 725, said this: "Protestants also minimized the importance to applicant and its affiliates of their being able to offer through service to final destination. They urged that in view of necessity for rest and lunch stops, and the usual changes in equipment, the transfer of the passengers from one line to another is not an inconvenience of any consequence. In theory that may be correct, but there is some evidence that a transfer from one line to another is looked upon by prospective passengers as an inconveience best to avoid. And in a measure, the presumption may be justified. A change from one line to another may involve the transfer from one station to another; it always involves a transfer of baggage, which, even if attended to by carrier employees, may engender a feeling of uneasiness and responsibility on the part of the passengers to see that it is properly done and nothing overlooked. If baggage is lost or damaged, or other claims incurred, the difficulty of obtaining a quick and satisfactory adjustment is increased by the necessity of dealing with more than one carrier."

In that case, a railroad owned bus carrier asked for duplicate routes over the lines of other carriers so as to provide a direct, through service on its own lines, just as

here. And the Interstate Commerce Commission granted the application.

The bus stations of connection lines may be a mile apart in certain communities and the weather bad, and the bus passengers unfamiliar with the communities, entailing all kinds of inconvenience, discomfort, and hazards, especially at night. This condition could be avoided here as the Gulf offered a continuous line service under its own management with only one probable change of busses at Louisville, where an empty bus would be awaiting each arriving bus for convenient transfer of passengers, when necessary. And also it would increase the convenience of transfer of baggage, by averting possibilities of its loss and facilitating its reaching the destination at the same time the passenger arrives there. It would also simplify and facilitate adjustments of claims, by limiting the adjustment to one line.

The argument against the grant of the proposed certificate to Gulf, that, if granted, the doors would be open to Tri-State, inviting it to seek duplicate certificates up and down Highway 15 over which Gulf now operates, in my opinion, is a non sequitur. When Tri-State can offer such an imposing array of reasons to support its claim that public convenience and necessity required such additional service on Highway 15, then, in my opinion, they should be granted a franchise there. However, it must be borne in mind that the duplication here is not for service but merely of the use of the highway. Service at local points on the controverted portions of the highways is excluded by the closed doors. Similar duplicate use of highways exists over many of them in this State, and is in harmony with the previous policy of the Public Service Commission, which, in many cases, has recognized such duplication as a useful auxiliary to the progressive development of passenger transportation in Mississippi.

Let us consider what arbitrary may be said to mean. The Supreme Court of the United States, in dealing with necessity of an assessment by the Comptroller of the

Currency, held that the word " 'arbitrary,' . . . can mean no more than do the other averments that the Comptroller, in reaching his conclusion, 'committed grave error of law' in failing to regard the contract as of February 17 as effective." Adams v. Nagle, 303 U. S. 532, 58 S. Ct. 687, 693, 82 L. Ed. 999. A Federal decision held that refusal by the Interstate Commerce Commission to consider pertinent evidence and to give substantial evidence the weight it manifestly carries in proceeding to amend rules required to be adopted under a Boiler Inspection Act "would be arbitrary action" subject to review by court. Boiler Inspection Act, 45 U. S. C. A. Sec. 22 et seq.; Baltimore & O. R. Co. v. United States, D. C. Ohio, 5 F. Supp. 929, 931. Arbitrary, therefore, is not such a shocking or opprobrious term as justifiably to cause it to become a bete noir to judicial review of an order of an administrative board.

With reference to the argument that if the franchise sought by Gulf were granted here, the addition of the Gulf busses to those now operated by Tri-State over the portion of the highways involved, would cause excessive use and wear and tear of the highway, it occurs to me that Tri-State, or any other bus line similarly situated, should be required to reduce the number of its busses in such an area rather than that the public should be deprived of an improved service by granting another motor carrier the right to the use of the public highways. As quoted above, the statute denies a proprietary right in any bus company to the highways built and maintained by the people of this State at the expense of its people. If any bus line be permitted to overload a particular strip of highway to the exclusion of another seeking to render an improved public service, and thereby successfully deprive the citizens interested in the greater convenience of the latter service, then such bus line, so permitted, would have handed to it a device by which it conceivably could foster its own monopoly, regardless of what the public necessity might be.

I think that the certificate should have been granted by the Public Service Commission as sought by Gulf, and that the circuit court was correct in reversing the order of the Commission, but not in directing the Commission to issue the certificate of convenience and necessity. In this connection, in 51 C. J., Sec. 141, p. 78, the rule is laid down that: "Unless otherwise provided by law, the order should be sustained or reversed by the court by entering its final decree, and not by directing the commission so to do, except when the cause is remanded to the commission for further proceedings. . . . a judgment of reversal does not preclude the commission from subsequently entering a proper order in the premises."

In the Pacific Power and Light Company case (Pacific Power & Light Co. v. Federal Power Comm.), 9 Cir., 98 F. (2d) 835-838, the Federal Circuit Court of Appeals considered the contention of the Federal Power Commission that Congress had not given the court the right to set aside the order in question because, after so setting aside the order and returning the proceedings to the Commission, "the situation is in statu quo ante the annulled order," the court disagreed with this contention and likened the situation to one of reversal of a judgment involving a new trial, saying "The relief granted is not, as claimed by the Commission, a mere futility leading to repetitions of the Commission's identical order and successive identical annulments by us. It will not be presumed that the Board, any more than a trial court, will repeat in its proceedings an error of law so determined by the judicial tribunal reviewing the order under the reviewing provisions of the Act creating the rights."

I therefore respectfully dissent. I think we should affirm the judgment of the circuit court reversing the denial of the certificates by the Commission, and remanding the case to the Commission, but that we should reverse that part of the court's judgment ordering the Commission to issue the certificate.